FIRST SAFETY FUND NATIONAL BANK *vs.* JANET M. FRIEL.

Worcester. November 19, 1986. — March 4, 1987.

Present: KASS, KAPLAN, & WARNER, JJ.

*Uniform Commercial Code,* Bank. *Negotiable Instruments,* Indorsement,
  Liability of representative. *Mistake. Contract,* Mistake. *Fraud.*

In an action by a bank against an officer of a corporation who had signed
  each of two promissory notes twice, once in a representative capacity
  on behalf of the corporation and once without any representative indicia,
  the officer was personally obligated under G. L. c. 106, § 3-403(2), as
  a comaker of the notes where, although the officer's undisclosed intention
  was to sign only in a representative capacity, she failed to demonstrate
  either that the bank had given her to understand that it was not looking
  to her credit, or that the bank's intent was not to look beyond the
  corporate assets; furthermore, there was no evidence of either mutual
  mistake or fraud on the part of the bank which would have relieved the
  officer of personal liability. [586-589]

CIVIL ACTION commenced in the Worcester Division of the
District Court Department on March 21, 1984.

The case was heard by *Thomas F. Sullivan, Jr., J.*

*Darragh K. Kasakoff* for the plaintiff.

*Richard J. Pentland* for the defendant.

KASS, J. On two separate occasions, Janet M. Friel, the
defendant, signed promissory notes on behalf of New England
Office Products Co., Inc., of which she was president. On
each note Friel signed twice: once, directly under the typed
name of the corporate borrower, she wrote "Janet M. Friel,
President"; upon the line below that signature she wrote, with-
out qualification, "Janet M. Friel." The question presented is
whether the second signatures rendered Friel personally liable
on the notes. We conclude that they did and reverse the court
below.

The appeal is from a divided opinion (Dohoney, J., dissenting) of the Appellate Division of the District Court for the Western District. See G. L. c. 211A, § 10, as amended by St. 1985, c. 314, §§ 4, 5, and see §§ 8 and 9. That tribunal dismissed a report, claimed by the First Safety Fund National Bank (bank), from a judgment entered by the trial judge in favor of Friel. Dismissal of the report had the effect of affirming the trial court judgment. See G. L. c. 231, § 108.

We take our facts from those found by the trial judge and for which there was a basis in the evidence summarized in the report to the Appellate Division. Friel became the president of the New England Office Products Co., Inc. (company), in 1981 upon the death of her husband, who had founded the company in 1972. Her presidency was substantially titular. General management of daily operations devolved upon Friel's brother-in-law, David Friel, but Mrs. Friel kept her hand in by keeping the checkbook and signing all corporate checks.

The loans in question were made on May 13, 1982, and March 30, 1983, in the amounts of $10,000 and $30,000, respectively. In connection with the later and larger loan, the bank took a security interest in "[a]ll of the [company's] inventory, present and future accounts and contracts receivable." Mrs. Friel signed the security agreement which memorialized that loan only once, expressly as president of the company. Early in 1984, the company ceased to do business, and it is implicit that at the time of its demise the company was insolvent, hence the bank's pursuit of Mrs. Friel.

Under the Uniform Commercial Code, "Unless an instrument clearly indicates that a signature is made in some other capacity it is an endorsement." G. L. c. 106, § 3-402, inserted by St. 1957, c. 765, § 1. To ram home the point, the commentators to the Code say that "any ambiguity as to the capacity in which a signature is made must be resolved by a rule of law that it is an indorsement." Comment to § 3-402 of the Uniform Commercial Code, 2 U.L.A. (Master ed. 1977). "[A] signature in the lower right hand corner of an instrument," the comment explains, "indicates an intent to sign as the maker of a note or

the drawer of a draft." Both of Mrs. Friel's signatures on each note were in the lower right hand corner. Even an authorized representative, e.g., the president of a corporation, who signs his own name to an instrument is personally obligated if the instrument does not show that the signature is made in a representative capacity. G. L. c. 106, § 3-403(2).

To be sure, when the name of a corporation is followed by the name and office of an authorized individual, that signature is made in a representative capacity. G. L. c. 106, § 3-403(3). Mrs. Friel's difficulty is that one signature fits in the 403(3) category, i.e., representative capacity; the second fits in the 403(2) category; i.e., it denotes personal obligation. Indeed, were there not some such purpose, signing a second time without a modifier as to representative status would be a peculiarly empty gesture. See *Tesoro Petroleum Corp.* v. *Schmidt,* 210 Neb. 537, 541 (1982). Dual obligations on the parts of a corporate borrower and its principal officers or stockholders are not unusual when small, closely held corporations borrow money. Reaching by lenders for the additional credit is the norm. *Rotuba Extruders, Inc.* v. *Ceppos,* 46 N.Y.2d 223, 231 (1978). White & Summers, Uniform Commercial Code 495 (2d ed. 1980). Although the dual signature point has not arisen in the Massachusetts cases, other jurisdictions have held a corporate officer personally liable when he or she has signed twice, once in a representative capacity and once without any representative indicia. *Lumbermen Associates, Inc.* v. *Palmer,* 344 F. Supp. 1129, 1129-1130 (E.D. Pa. 1972) (second signature on the back of the note). *Porter* v. *Pfahl,* 8 Ariz. App. 486, 487 (1968). *Tesoro Petroleum Corp.* v. *Schmidt,* 210 Neb. at 541-543.

That does not, however, end the inquiry. The person who signs a note in an apparent individual capacity may escape personal liability by establishing that the immediate parties to the note — here the bank, the company, and Mrs. Friel — had established that personal obligation was not to attach. G. L. c. 106, § 3-403(2)(*b*). The burden of affirmatively show-ing the parties had "otherwise established" that personal liability

would not attach to an apparently unqualified signature on a note falls upon the signer. *Commonwealth Bank & Trust Co.* v. *Plotkin,* 371 Mass. 218, 220 (1976). *Carlton Ford, Inc.* v. *Oste,* 1 Mass. App. Ct. 819, 820 (1973). *Leahy* v. *McManus,* 237 Md. 450, 454-455 (1964).[1]

In the instant case the Appellate Division concluded on the basis of the report and the trial judge's findings of fact that the bank and Mrs. Friel had established she would not be personally liable. We, therefore, recite additional elements of the facts. It was David Friel who applied for the loans on behalf of the company and conducted whatever negotiations were involved. He arranged to accompany Mrs. Friel to the bank, where, after small talk, a bank officer presented prepared loan documents and instructed Mrs. Friel to sign her name and title, then pointed to the next line and told her to sign only her name. Mrs. Friel asked no questions about why she was asked to sign twice. She glanced over but did not read the papers — at least not in any comprehending fashion. Reading the instruments carefully would not have done her much good, as Mrs. Friel was without experience in business, banking, or corporate finance. There were no words such as "co-maker" or "guarantor" next to the defendant's signature, nor was there anything in the text of the notes which would have alerted an unsophisticated bank customer that a second signature without a title indicating representative capacity would create personal liability.

The address of the promisor on the notes was that of the company. Loan proceeds were for company purposes. Mrs. Friel did not intend that her signatures create personal liability on the notes. For its part, the bank at neither of the signing

---

[1] If the signature is wholly without earmarks of qualification, i.e., if the corporate name had not appeared on the note and she had signed it simply, "Janet M. Friel," parol evidence would be inadmissible to disestablish her obligation. G. L. c. 106, § 3-403(3), and comment 3 to § 3-403(3) of the Uniform Commercial Code, 2 U.L.A. (Master ed. 1977). *Norfolk County Trust Co.* v. *Vichinsky,* 5 Mass. App. Ct. 768 (1977). *Lerman Container Corp.* v. *Letourneau,* 35 U.C.C. Rep. Serv. 547, 548 (D. Mass. 1982).

ceremonies warned Mrs. Friel that her second signatures created personal obligations.

What follows from the facts found by the trial judge was that the bank and Mrs. Friel had not arrived at common ground. That is the antithesis of the immediate parties to the instrument having "established" limits of liability, a word that implies an agreement. We may accept as a fact Mrs. Friel's subjective understanding that she was signing for a purely corporate loan but, in order for her to prevail, the bank must either (1) have given her to understand that it was not looking to her credit or (2) it must appear that the bank's intent was not to look beyond the company's assets. Neither proposition finds support in the facts found or the compendium of the evidence contained in the report.

From those sources we know that Mrs. Friel did not negotiate the terms of the loans, she asked no questions, and the bank said nothing one way or the other about requiring her to become personally obligated on the loans. All that falls well short of an affirmative showing that the parties had agreed that the corporation was to be solely liable. As in *Commonwealth Bank & Trust Co.* v. *Plotkin,* 371 Mass. at 221-222, we know something about the borrower's intent, but there is no manifestation of intention on behalf of the bank. See also *Carleton Ford, Inc.* v. *Oste,* 1 Mass. App. Ct. at 820; *Norfolk County Trust Co.* v. *Vichinsky,* 5 Mass. App. Ct. 768 (1977). An undisclosed intention by a maker to sign only in a representative capacity does not establish the understanding required by G. L. c. 106, § 3-403(2)(*b*). See *Kuhns* v. *Coussement,* 412 So.2d 779, 782 (Ala. Civ. App.), aff'd, *Ex parte S.H. Coussement,* 412 So.2d 783 (Ala. 1982); *Rotuba Extruders, Inc.* v. *Ceppos,* 46 N.Y.2d at 230; *Seale* v. *Nichols,* 505 S.W.2d 251, 254-255 (Tex. 1974); *In re Turner,* 32 Bankr. 244, 250 (D. Mass. 1983).

In its opinion, the majority of the Appellate Division appears to have relieved the defendant of liability on the basis of defenses of mutual mistake and fraud. There was, however, no finding — nor would evidence have supported it — that the bank was mistaken about Mrs. Friel's personal obligation. That

the bank asked for her indorsement on two separate occasions, a year apart, and did not seek a second signature on the security agreement (on which it would have been of no effect) bespeaks a conscious policy. Mrs. Friel may have been mistaken as to the consequence of her second signatures but the mistake of one party to the transaction is not sufficient to invoke the principle of mutual mistake; the mistake must be shared by both parties. *Century Plastic Corp.* v. *Tupper Corp.*, 333 Mass. 531, 534 (1956). *Berman* v. *Sandler,* 379 Mass. 506, 509-510 (1980). *LaFleur* v. *C.C. Pierce Co.,* 398 Mass. 254, 258 (1986). See *Maloney* v. *Sargisson,* 18 Mass. App. Ct. 341, 345-346 (1984); Restatement (Second) of Contracts § 152 (1979). Contrast *Dover Pool & Racquet Club, Inc.* v. *Brooking,* 366 Mass. 629, 633-634 (1975). There are limited circumstances in which a party may avoid a contract on the basis of a unilateral mistake: "if he does not bear the risk of mistake . . ., and (a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or (b) the other party had reason to know of the mistake or his fault caused the mistake." Restatement (Second) of Contracts § 153 (1979). See *Covich* v. *Chambers,* 8 Mass. App. Ct. 740, 749-750 and n.13 (1979). A contract is unconscionable if "the sum total of its provisions drives too hard a bargain for a court of conscience to assist." Restatement (Second) of Contracts § 208 comment b. *Covich* v. *Chambers, supra,* n.13. *Campbell Soup Co.* v. *Wentz,* 172 F.2d 80, 84 (3d Cir. 1948). As we have seen, a note of a close corporation indorsed by a principal officer is a commercial commonplace, hence scarcely unconscionable. The record does not suggest that the bank knew or had reason to know about Mrs. Friel's ignorance of the consequences of her second signature. Section 3-402 of the Uniform Commercial Code, discussed above, places the risk of mistake on the signer of an instrument. See Restatement (Second) of Contracts § 154. See also *Allen* v. *Plymouth,* 313 Mass. 356, 362-363 (1943), stating the general rule that relief is not granted for a mistake about what the law is if a person is ignorant of the law or mistaken about what it prescribes.

As to fraud, it requires a material misrepresentation or, through words or conduct, the conveyance of half truths which

deceive. See *Kannavos* v. *Annino,* 356 Mass. 42, 46-49 (1969); *Nei* v. *Burley,* 388 Mass. 307, 310 (1983). The failure of the bank to explain to Mrs. Friel the consequences of her second signature did not rise to fraud. *Swinton* v. *Whitinsville Sav. Bank,* 311 Mass. 677, 678-679 (1942). There were no preliminary dealings between Mrs. Friel and the bank by which she might have been misled. On neither signing occasion did the parties discuss the legal significance of the instruments and the signatures required of Mrs. Friel. This is not a case, as the defendant argues, where silence would reasonably lead a party to a particular conclusion. Contrast *Richardson Elec. Co.* v. *Peter Francese & Son,* 21 Mass. App. Ct. 47, 51 (1985).

One might wish that a conscientious loan officer would explain the consequences of documents and signatures to a borrower not represented by counsel, but the law, in a commercial transaction context, imposes no duty so to do. In the instant case, it should be remarked, the record does not permit us to suppose that the bank officer was aware of the defendant's commercial naivete. The bank officer may well have felt no call to discourse on what he would have thought a quite routine transaction.

Our conclusions are consistent with the policy expressed in the comment to G. L. c. 106, § 3-402, to give consistent meaning to what appears on the face of commercial paper. See *Havatampa Corp.* v. *Walton Drug Co.,* 354 So.2d 1235, 1237 (Fla. Dist. Ct. App. 1978); *In re Turner,* 49 Bankr. 231, 236 (D. Mass. 1985).

When reviewing decisions of the Appellate Division, we can make such order as the Appellate Division ought to have made. *Elliott* v. *Warwick Stores, Inc.,* 329 Mass. 406, 410 (1952). The judgment entered in the trial court is reversed. Judgment is to enter for the plaintiff for the unpaid principal amounts of the two notes, together with accrued interest, plus reasonable attorney's fees (for which the notes provided) incurred by the plaintiff.

*So ordered.*