PAULINE A. HOGAN *vs.* ROBERT L. RIEMER.[1]

No. 92-P-291.

Middlesex. May 5, 1993. - September 24, 1993.

Present: BROWN, KASS, & LAURENCE, JJ

*Practice, Civil,* Summary judgment. *Evidence,* Extrinsic affecting writing, Parol evidence. *Loan. Mortgage,* Real estate. *Fraud. Consumer Protection Act,* Availability of remedy.

In an action by the borrower on a second mortgage loan alleging that the lender had acted unfairly and deceptively within the meaning of G. L. c. 93A, §§ 2 and 9, by luring the plaintiff into a loan more onerous than initially described to her, and had said it would "work with her" if she ran into financial difficulties, the judge correctly granted summary judgment in favor of the defendant, where there were absent the essential elements of misrepresentation of material facts, made to induce the plaintiff to enter the loan agreement, and reasonable reliance on any false statement to the detriment of the plaintiff, and where the plaintiff's claims of reliance on an expectation of cooperation were belied by her failure ever to have asked for cooperation. [364-368] BROWN, J., dissenting.

CIVIL ACTION commenced in the Superior Court Department on February 28, 1989.

The case was heard by *John J. O'Brien,* J., on a motion for summary judgment.

*Christopher L. Maclachlan* for the plaintiff.

*Lawrence J. Crowley, Jr.* (*Isaac H. Peres* with him) for the defendant.

KASS, J. Pauline Hogan made an imprudent second mortgage loan which, in fairly short time, caused her to lose her house. She brought an action against the lender, Robert L. Riemer, doing business as Pickwick Financial Associates ("Pickwick"), seeking varieties of relief. The common pre-

---

[1]Doing business as Pickwick Financial Associates.

mise of all her claims of relief was that Pickwick had initially offered more favorable loan terms than the loan documents signed by Hogan contained, and that Pickwick's representative had said at the loan closing that Pickwick did not want her house and would "work with" Hogan were she to get into financial difficulty.

On appeal, the sole issue Hogan urges is that the materials submitted by the parties in support of and opposition to a defense motion for summary judgment disclosed differences about material facts bearing on whether Pickwick had acted unfairly and deceptively within the meaning of G. L. c. 93A, §§ 2 and 9. The nature of the unfair and deceptive conduct, as indicated above, was that Pickwith had lured Hogan into a loan more onerous than initially described to her and had said it would "work with her" if she ran into financial difficulties. A judge of the Superior Court awarded summary judgment to the defendant Pickwick. We affirm.

*Undisputed facts.* From the affidavits, a deposition, and documentary evidence served up to the Superior Court judge for his consideration on a defense motion for summary judgment, material undisputed facts emerged as follows. Hogan was in the process of divorce from her husband. She desired to buy his interest in the marital residence at 79 Claflin Street, Belmont. By the terms of a separation agreement (found fair and reasonable by a judge of the Probate Court and incorporated in the judgment nisi), Hogan was to acquire her husband's interest in the marital residence for $125,000, of which $85,000 was to be paid in exchange for his deed by January 31, 1988, the remaining $40,000 at such time as she sold the property. With the purpose of raising cash to conclude the buy-out of her husband and to pay other debts, Hogan applied to Pickwick for a loan. At the time she applied for the loan, Pickwick was aware that her average monthly income was $2,000. On January 15, 1988, she closed a loan with Pickwick for $138,000, secured by a second mortgage on the 79 Claflin Street property. Following the recording of title and loan documents, Pickwick disbursed $85,000 to the husband's counsel, $35,590 to the bor-

rower, $8,000 to an interest reserve fund (at Hogan's request that amount had been reduced from $10,000 and the net loan proceeds to Hogan had been increased by $2,000), and the balance to various fees and costs such as a mortgage broker's commission, an origination fee, legal fees, and a title insurance premium. A consumer disclosure statement set out the annual percentage interest, finance charge expressed in dollars, the amount financed and the total payments which would be made over the two year period of the loan.

The disclosure statement also set forth the estimated monthly amount due on the loan, viz., $2,157.05. Prior to the making of the loan, Hogan had visited at Pickwick's place of business and had discussed loan terms with a loan officer. Hogan said that temporary financial embarrassment prevented her from paying debt service at once and asked for a six-month cushion until her business (a florist shop at the Eastern Airlines terminal at Logan airport) cash flow improved. The lesser cushion for interest payments (five months) was a change in loan terms which Hogan requested at the closing. Hogan at closing received from Pickwick a notice that she was entitled to rescind the loan within three days. Throughout the closing, Hogan was accompanied by the lawyer who was representing her in connection with her divorce.

Pickwick, in May, 1988, sent a notice (with the heading, "A Friendly Reminder . . .") to Hogan that on June 1, 1988, her first payment, in an estimated amount of $1,790,[2] would be due on her loan. Hogan had suffered business setbacks, was unable to make any loan payment, and, thus, defaulted on the note to Pickwick. On June 17, 1988, Pickwick, with an unfriendly reminder, declared the entire note due and payable and announced it was commencing foreclosure proceedings. A judgment having the effect, among

---

[2]The record does not explain why this figure is less than the estimated monthly amount due on the loan.

others, of authorizing a foreclosure sale was entered in the Land Court on October 26, 1988.[3]

*Disputed facts.* (i) *Loan amount.* An affidavit by Hogan said that when she first made contact with Pickwick, its representative said it would be willing to lend "as much as $150,000, to be repaid with monthly payments not to exceed $1,200." Pickwick's affidavit said their preliminary conversation was about a loan of approximately $110,000, with net proceeds of $100,000, and that Hogan later had requested the larger loan. (ii) *Term of loan.* Pickwick said that it offered Hogan a choice of a long-term or short-term loan and that she opted for the latter. Hogan denied having requested a short-term loan (which is what she got) and said that she asked for a long-term loan. (iii) *Interest rate.* There is disagreement whether she was apprised of the interest rate. (iv) *Monthly payments.* Hogan said she was initially told monthly payments would be between $1,000 and $1,500 per month. In another affidavit Hogan asserted that she was assured monthly payments would not exceed $1,200. Pickwick said it had informed her of an estimated monthly payment of $1,695 on a proposed $110,000 loan. (v) *What Hogan knew before closing.* Hogan said she did not know what the loan amount was until she arrived at the closing. (vi) *Promise not to foreclose.* Hogan said Pickwick reassured her "that everything would be alright, that if I had payment problems, that they would work with me" and "would not take my house." Her lawyer testified in deposition that he recalled no more than "a promise to at least try to resolve difficulties down the road, a promise of a future course of dealings," which he regarded at the time as passing conversation while papers were reviewed and to which he attributed no particular significance. (vii) *Review of closing documents.* Pickwick claims its loan officer at the closing reviewed with Hogan each provision of the closing documents paragraph by paragraph. In his

[3]In the action underlying this appeal, Hogan received a preliminary injunction enjoining a foreclosure sale scheduled for March 1, 1989. The entry of judgment in favor of Pickwick on its motion extinguished the preliminary injunction on April 23, 1991.

deposition, Hogan's lawyer testified that the loan papers were carefully reviewed at closing. Hogan asserts that Pickwick's representative did not review the loan documents with her, that she "never reviewed all the documents and terms of the loan prior to signing them," and says that, "It was only after I had signed the documents that I realized the terms of the loan were different from what had been originally promised to me."

For purposes of judging whether summary judgment ought to have been granted, the existence of disputed facts is consequential only if those facts have a material bearing on disposition of the case. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). *Norwood* v. *Adams-Russell Co.*, 401 Mass. 677, 683 (1988). *Beatty* v. *NP Corp.*, 31 Mass. App. Ct. 606, 607 (1991). The substantive law will identify whether a fact, in the context of the case, is material. *Beatty* v. *NP Corp.*, *supra* at 608. See also *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 711 (1991).

Assuming, for purposes of analysis, that the parties, in earlier conversations, discussed loan terms at variance with those later reflected in the loan papers, the detailed and integrated legal documents executed by Hogan with her lawyer at her side would, in the absence of fraud, supersede earlier conversation. Were it otherwise, there would not be much point in drawing and executing integrated documents. Cf. *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. 704, 710-711 (1990); *Cambridgeport Sav. Bank* v. *Boersner*, 413 Mass. 432, 441-442 (1992). See *Turner* v. *Johnson & Johnson*, 809 F.2d 90, 96 (1st Cir. 1986). To a major extent, that is what the parol evidence rule is about. See *Glackin* v. *Bennett*, 226 Mass. 316, 319-320 (1917); *Sherman* v. *Koufman*, 349 Mass. 606, 610 (1965); *Bendetson* v. *Coolidge*, 7 Mass. App. Ct. 798, 802-803 (1979). See also *Amerada Hess Corp.* v. *Garabedian*, 416 Mass. 149, 155 (1993).

The integrated documents barrier may be penetrated by evidence tending to show that the documents are not, in fact, complete, *Ryder* v. *Williams*, 29 Mass. App. Ct. 146, 149-150 (1990), or that the execution and delivery of the docu-

ments were induced by fraud. *Bates* v. *Southgate*, 308 Mass. 170, 182 (1941). *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. at 711 n.5. Hogan's affidavits do not suggest incompleteness of the loan documents. Nor do those affidavits suggest fraud in the sense that the content of the documents or their significance at the time of closing was misrepresented. Read favorably to Hogan, as is appropriate in the case of the party resisting summary judgment, she signed the documents as they were because of the pressure imposed by her divorce settlement to obtain the loan funds. Nothing appears in her statements, however, which reflects that at the loan closing (or at any time thereafter, prior to her default) Hogan remonstrated about the loan terms or even mentioned they were at variance with what she had expected. There are absent the essential elements of misrepresentation of a material fact, made to induce action, and reasonable reliance on the false statement to the detriment of the person relying. See *Zimmerman* v. *Kent*, 31 Mass. App. Ct. 72, 77 (1991). See also *Plumer* v. *Luce*, 310 Mass. 789, 805 (1942); *First Safety Fund Natl. Bank* v. *Friel*, 23 Mass. App. Ct. 583, 588-589 (1987). Statements of expectation, such as, "We'll work with you," do not support an action for common law fraud. *Acushnet Fed. Credit Union* v. *Roderick*, 26 Mass. App. Ct. 604, 605 n.1 (1988). See *Schwanbeck* v. *Federal-Mogul Corp.*, 31 Mass. App. Ct. 390, 399-400 n.7 (1991), *S.C.*, 412 Mass. 703 (1992).

An act or practice may, however, be unfair or deceptive, within the meaning of G. L. c. 93A, § 2, if it may reasonably be found to have caused a person to act differently than she otherwise might have. *Lowell Gas Co.* v. *Attorney Gen.*, 377 Mass. 37, 51 (1979). *Fraser Engr. Co.* v. *Desmond*, 26 Mass. App. Ct. 99, 104 (1988). The acts complained of were the statements that a loan for $150,000 could be made and the payments would be between $1,000 and $1,500 monthly. If made, those statements were made on preliminary inquiry when outlines of a loan appear to have been discussed in very general terms. It bears repeating that Hogan does not claim to have protested the terms of the loan papers presented to

her and to her lawyer at closing, although she says she
learned at the closing that they "were vastly different than
had been originally represented to me."[4]

Hogan argues, however, that the exigencies and pressures
of the divorce proceedings placed her under duress to proceed
with the loan, whatever the terms,[5] and that Pickwick knew
this. Anxiety in the context of divorce is routinely present
and is not generally a basis for repudiation of legal agree-
ments. *Grindlinger* v. *Grindlinger*, 10 Mass. App. Ct. 823
(1980). Any person who arrives at a loan closing generally
has fiscal needs which act as a powerful force to go through
with the transaction. A borrower's anxiety, sense of external
pressure, and need for the funds is not a sound basis for re-
lieving the borrower from the obligations the borrower has
subscribed to in the loan documents. During the three days
after the closing when Hogan had the right, under the loan
documents, to reconsider and rescind the loan, she did not
avail herself of that right, although she was then relieved of
the possibly heightened pressure of the closing room. Hogan
has alleged no violations of then applicable State regulations
governing loans to consumers secured by mortgages on their
residences.[6]

---

[4]The only hint of objection appears in the deposition of Hogan's lawyer,
who said: "Pauline . . . complained or objected that she thought it would
be $1,500 a month and that it would be on for a longer period of time."

[5]In one affidavit Hogan states that she went through with the loan be-
cause she had to in order to comply with her divorce settlement agreement.
In another affidavit she says she did not know what was in the loan docu-
ments until after she signed them and that, although, accompanied by her
lawyer, he was only there in connection with her divorce, i.e., not to advise
her about the loan. The lawyer testified in deposition that he did discuss
the loan papers with his client. He did not "think [the loan] was so un-
usual in any sense that I would, as I said, drag her out of the room."

[6]Regulations designed to protect Massachusetts consumers seeking resi-
dential mortgage loans for home improvements and other purposes, other
than for purchase of the property, were adopted effective August 1, 1992.
See 940 Code Mass. Regs. § 8.00 (1992). Those regulations make unlaw-
ful "bait advertising" which means "an alluring but insincere offer to pro-
cure, arrange, or otherwise assist a borrower . . . on terms which the bro-
ker or lender cannot, does not intend, or want to provide. . . ." 940 Code
Mass. Regs. § 8.03 (1993). The regulations are particularly aimed at ad-
vertising practices. See 940 Code Mass. Regs. § 8.04 (1993). Even though

It remains to consider whether the statements by Pickwick that they would help work things out with Hogan, if she encountered payment difficulties, constituted an inducement to Hogan to obtain an onerous loan. A similar basis for judicial intervention based, not on a then nonexistent c. 93A, but on principles of equity, was made in *Hall* v. *First Natl. Bank*, 173 Mass. 16, 19 (1899). There the alleged promise was that the lender would renew the note until such time as the borrower's business situation should improve. The court characterized the purported promise, more specific, actually, than that claimed to have been made in the instant case, as "a hopeful encouragement sounding only in prophecy." Highly generalized expressions of good will such as, "We'll work with you," and "We don't want to own your house," do not cause a borrower of ordinary perspicacity, who signs highly specific loan documents, reasonably to believe that the documents are without meaning. To the extent such statements might be construed as promises of forbearance in the face of less than full performance of a borrower's obligations or a request for a refinancing plan based on financial realities, that was not the case here. Hogan made no such proposal; rather she simply never paid the first dollar on her mortgage debt.[7] Her claims of reliance on an expectation of coopera-

---

enacted four and one-half years after the loan involved in the instant case, the regulations illuminate what might be regarded as unfair and deceptive practices. Advertising in the sense the word is generally understood, see *Smartfoods, Inc.* v. *Northbrook Property & Cas. Co.*, ante 239, 243 (1993), was not involved in this case. Hogan was referred to Pickwick by a mortgage broker named Loan Depot. She makes no complaints against Loan Depot having misrepresented what sort of loan she could obtain. It does not appear from the materials on summary judgment that Pickwick engaged in conduct proscribed by the Attorney General's regulations.

[7]In his dissenting opinion, Justice Brown writes that the lender violated G. L. c. 93A by making a loan that the borrower could not reasonably be expected to repay because of her limited means. That is not a point which the borrower has argued. On the record, we do not know much about her means. Her marital separation agreement recites that she owned with her husband, two time-sharing units on Cape Cod and owned solely in her name two additional units (the agreement does not specify what the units are) on Cape Cod, one unit in Rhode Island, and one (time share) in the Bahamas. We do not know what she represented as to her ability to repay the loan from Pickwick. Hogan does say she suffered business reverses,

tion are belied by her failure ever to have asked for cooperation.

*Judgment affirmed.*

BROWN, J. (dissenting). I strongly disagree. In my view, summary judgment should not have been granted by the lower court. Construing the disputed facts, as we must (and which the majority failed to do), in the light most favorable to the plaintiff, the following scenario emerges.

Unable to obtain conventional financing to buy out her husband's share of the marital home, Pauline Hogan contacted a mortgage broker, Loan Depot, which in turn (for a $5,700 commission) referred her to Robert L. Riemer, doing business as Pickwick Financial Associates. Pickwick's loan officer, Mark Cohen, with whom Hogan dealt throughout this transaction, informed her that it would be willing to lend her up to $150,000 to be repaid in monthly payments not exceeding $1,200. It is undisputed that Cohen knew that Hogan's average monthly income at this time was approximately $2,000. The payments required by Pickwick's loan documents, however, called for estimated monthly payments of $2,157.

Hogan was never informed before the closing as to the specific terms of the loan. At the closing, none of the loan provisions was read or explained to her either by Cohen or her own counsel. Hogan did not review the documents prior to signing them. She did not realize until after she had signed them that the terms of the loan were drastically different from what Cohen had represented to her.[1] For example, al-

---

suggesting a deterioration of her financial picture between the time of the loan and the beginning of foreclosure proceedings on July 20, 1988. The majority think the observations of the dissenting opinion about the performance of Hogan's lawyer are not warranted on the record before us.

[1]The onerous loan provisions, which are not disputed, include the following: (a) a variable interest rate with a minimum of 18.5 percent and a maximum of 28 percent (at the time of the closing the interest rate was 23.75 percent); (b) a prepayment penalty of four months interest (more

though Hogan had specifically requested a long-term fixed mortgage, the loan documents provided for a short-term, variable rate loan, with monthly payments of interest only and a balloon payment of the full principal in two years.

At the closing, presumably to allay Hogan's concerns about repayment, Cohen assured her that if there was a problem Pickwick would "work with" her and would not take her house. On June 17, 1988, however, just *sixteen days* after Pickwick claims Hogan's first payment was due, the note was accelerated and foreclosure proceedings were commenced.

Based on these facts, if proven, a fact finder could determine that Pickwick's conduct constituted an unfair practice in violation of G. L. c. 93A, §§ 2 and 9. It is settled that conduct not otherwise illegal may nonetheless be unfair within the meaning of c. 93A. *PMP Assocs., Inc.* v. *Globe Newspaper Co.*, 366 Mass. 593, 595-596 (1975).

The facts rehearsed above easily meet the *PMP Assocs.* test for unfairness. The circumstances of this case fall within the penumbra of G. L. c. 140D (the Consumer Credit Disclosure Act).[2] The "immoral, oppressive, unethical [and] unscrupulous" nature of this loan is underscored by the fact that the borrower's limited means with which to repay the loan were known to the lender. Indeed, a fact finder reasonably could conclude that in these circumstances the lender knew, or could reasonably have predicted to a virtual certainty, that the borrower had no capacity to repay. More to the point, it appears to me that the loan was made, not for the purpose of assisting a temporarily distressed borrower, but rather to acquire her equity in the property and to gain additional financial benefit from the panoply of generous fees appurtenant to the loan origination, the closing, and the all

---

than $8,000); (c) a late charge of one percent per month (a minimum of $1,380), and (d) additional interest upon default of 3.5 percent per month.

[2]See also the newly enacted regulations (840 Code Mass. Regs. §§ 8.00 et seq. [1993]) promulgated specifically to address the unfair and deceptive trade practices of the second-mortgage loan industry.

but inevitable foreclosure.[3] That the lender pulled the trigger a mere sixteen days after the initial default supports this theory, and suggests that Pickwick never harbored any intention to work with the borrower. This loan is so obviously contrary to prudent lending practices that no conscientious lender could in good faith have made it. Cf. *Carter* v. *Empire Mut. Ins. Co.,* 6 Mass. App. Ct. 114 (1978).

For the purposes of c. 93A, unfairness is determined from *all* the circumstances of the transaction, *Martin* v. *Factory Mut. Research Corp.,* 401 Mass. 621, 623 (1988), and the issue whether the defendant's conduct was unfair is ultimately a question of fact. *Spence* v. *Boston Edison Co.,* 390 Mass. 604, 616 (1983). As to that issue the plaintiff, on this record, has, in my view, met her burden in opposition to the defendant's motion for summary judgment.

That Pickwick's conduct was also "deceptive" within the meaning of G. L. c. 93A, § 2, is almost axiomatic. Throughout their negotiations, the plaintiff was promised loan terms far more favorable than those with which she was finally presented at the closing. Under the gun of a Probate Court order requiring her to pay her former husband $85,000 by January 31, 1988,[4] — only sixteen days after the closing — Hogan believed she had no choice but to sign the agreements as presented to her by the defendant.

I concur with the majority that, with respect to a common law claim of fraud, the plaintiff's written acceptance of the new terms of the loan served to vitiate whatever fraud may have occurred previously. However, in the light of abundant decisional precedent, I think it clear that defenses to common law claims are not always available to chapter 93A claims. See *Heller* v. *Silverbranch Constr. Corp.,* 376 Mass 621, 626 (1978).

In addition, the defendant's assurances to the plaintiff that it would "work out" any financial problems that arose and

---

[3]It should be noted that it appears that virtually all of these ancillary services were performed by the lender and its attorney.

[4]In entering into her divorce settlement, Hogan relied on Pickwick's representations as to favorable loan terms.

that it "did not want her house," reasonably could have caused a person in the plaintiff's position to go forward with the loan even when presented with materially different, and more onerous, terms. See *Fraser Engr. Co.* v. *Desmond*, 26 Mass. App. Ct. 99, 104 (1988). That issue should have been left for the fact finder, and was not appropriately determined on the record before the Superior Court.

Finally, the context of the entire transaction has been cause for concern throughout the litigation. Therefore, I feel compelled to comment upon it. The plaintiff entered into this transaction in order to comply with her divorce decree. While the decree is not before this court, Pickwick's representations to Hogan are inextricably intertwined with her divorce settlement, as she relied on them in negotiating that settlement.

Granted, this plaintiff was represented at the closing by an attorney — her divorce attorney. But she should not be penalized for her counsel's apparent failure to render sound professional advice about the transaction.[5] I place little stock in his self-serving deposition testimony explaining his "understanding" of the contemporaneous statements made at the loan closing.

A final observation: the plaintiff lost her home in the wake of her divorce, a reality consistent with the all too familiar trend in which women experience a significant drop in their standard of living after divorce. See Gender Bias Study of the Supreme Judicial Court 27-39 (1989).

In sum, the plaintiff was doomed from the time that Pickwick glimpsed her financial circumstances and saw the significant equity in her home available for potential plundering.

---

[5]Whether her attorney was preoccupied with getting his fee from the loan proceeds, or was simply incompetent, cannot be determined from this record. In either case, the most that can be said of his role was that he acted, to use the vernacular, as a "potted plant."