Billings, Thomas P., J.
The plaintiff filed a lawsuit on December 17, 1999 against the defendants, her previous employer and supervisor respectively, for multiple counts of sexual harassment. The defendants filed a Motion for Summary Judgment on all counts on March 14, 2003. In a decision entered July 15, 2003, I allowed the Motion in part and denied the Motion in part [17 Mass. L. Rptr. 101). This Court then dismissed the plaintiffs claim of retaliation (among other claims).
On October 17, 2005, the plaintiff filed a Motion for Reconsideration of this Court’s dismissal of plaintiffs retaliation claim on the grounds of change in applicable law. The reason given is the First Circuit’s recent decision in Noviello v. City of Boston, 398 F.3d 76 (1st Cir. 2005), addressing the concept of “retaliatory harassment.” Two days ago, the retaliatory harassment doctrine was more firmly rooted in Massachusetts law, and its relationship to the continuing violation doctrine more clearly articulated, in the SJC’s decision in Clifton v. Massachusetts Bay Transp. Auth., (12/21/05). This opinion takes account of these recent developments.
For the following reasons, the plaintiffs Motion for Reconsideration is ALLOWED, and her retaliation claim — to the extent it relates to “retaliatory harassment” — is restored to the case to be tried.

FACTS

The facts of the case that are either undisputed on the summary judgment record or taken in the light most favorable to the plaintiff are as follows. At the time this lawsuit was filed, Mary “Sandy” Gerrie (“Gerrie” or “plaintiff’) was a sixfy-six-year-old gay female who had been working as a quality assurance inspector for Karl Storz Endovision, Inc. (“Karl Storz”) in California since 1990. Prior to this litigation, plaintiff had approximately twenty years of experience and extensive technical training in her field. In 1992, plaintiff was sent by Karl Storz to Massachusetts to found the quality assurance department (“QAD”) at the Karl Storz facility in Charlton, Massachusetts. For eight months, plaintiff set up and ran this department as its acting manager completely on her own. Plaintiff was commended by Karl Storz’s President for her work on this assignment.
In April 1993, Rod Boucher (“Boucher,” collectively with Karl Storz, “Defendants”) was hired as the new manager of plaintiffs department and plaintiff returned to her job as an Inspector for the QAD. About the time of Boucher’s arrival, the inspectors of the QAD began to share working space with the testing component of the QAD. It was at this time that the plaintiff began working in close physical proximity with Earl Harris (“Harris”) and Bob Ertsgard (“Ertsgard”), and later, about April 1995, with Michael Gilbert (“Gilbert”). Boucher, as manager of the QAD, was the immediate supervisor to all of these individuals and his office space was in close proximity to their desks. Boucher in turn was supervised by Tom Cooksey.

1. Co-workers’ Actions Against the Plaintiff

Shortly after plaintiffs arrival in Massachusetts, she began to be subjected to harassment by certain of her co-workers, which worsened considerably after the inspection and testing components of the QAD merged. Ertsgard, Harris, and later Gilbert consistently and repeatedly made harassing and offensive comments to and around the plaintiff. Either Harris *413 or Ertsgard addressed the plaintiff, at least once a day, with a variety of highly offensive terras whose common themes were sexual preference, gender, age, and physical appearance. The trio also referred to the plaintiff with these terms publicly in conversations with each other and to others in the QAD. Harris and Ertsgard additionally frequently made comments to the plaintiff that she dressed like a dyke; that she should not be in a man’s job such as inspection; and that only filing and answering the phone were suitable work for her as a woman. Once Gilbert began working in the QAD, he refused to interact with the plaintiff, never making eye contact or speaking with plaintiff. Harris’s abuse continued until he was transferred to another department in August 1996; Ertsgard’s abuse continued until he left Karl Storz in September 1996; and Gilbert’s abuse continued until the plaintiff left Karl Storz in January 1997.
Harris, Gilbert, and Ertsgard also engaged in physical acts calculated to make the plaintiff uncomfortable. They frequently would stare at the plaintiff without blinking for long periods of time, occasionally mumbling to each other and laughing. Ertsgard would deliberately walk into the plaintiff, forcing her to go around him or be knocked down. On multiple occasions, Ertsgard followed the plaintiff into the ladies’ bathroom, turned the lights out, and threw balls of wet paper towels at the plaintiffs stall. Ertsgard and Gilbert also on multiple occasions displaced the plaintiffs work equipment and erased data that she put into the computers.
In April 1996, Boucher instructed plaintiff to train Gilbert. Plaintiff first asked why she had not received this training although she had requested it. Plaintiff was informed that she was not receiving the training because she was planning to retire; plaintiff, however, had no plans to retire for several more years. Plaintiff attempted to train Gilbert, but as per usual, Gilbert refused to make eye contact or speak directly to plaintiff. Instead, Gilbert informed Boucher and others in the QAD that he did not work with old women, fat women, and dykes. In one incident on or about April 30, 1996, plaintiff informed Gilbert that he had incorrectly entered numbers in a log and suggested that he change them; Gilbert had no response, but Ertsgard, who was also present, said, “he doesn’t have- to do that you old bitch.” Plaintiff reported the incident to Boucher. Although Boucher did speak to Ertsgard, plaintiff was also blamed for refusing to train Gilbert.
In the summer of 1996, criminal charges were filed against Ertsgard and another employee for threatening the life of a witness. Karl Storz was conducting an investigation into a sexual harassment complaint that another female Karl Storz employee had filed with the Massachusetts Commission Against Discrimination (“MCAD”).

2. Karl Storz’s Harassment Policy and Plaintiff’s Complaints

Prior to November 5, 1996, Karl Storz’s office policy, as published to its employees, directed that individuals who felt they were being discriminated against were to report the offenders to the complaining individual’s supervisor and to the human resources department (“HRD”). It was not until November 5, 1996 that Karl Storz’s written policy finally informed Karl Storz’s employees that in addition to internal complaints, if they felt they were being harassed, they had the legal right to file a complaint with the MCAD or to file a lawsuit.
Pursuant to the office policy in effect at Karl Storz for the bulk of plaintiff s employ, plaintiff reported her harassment to Boucher. It is not clear when plaintiff first complained to Boucher, though it might have been on or about June or July 1993. Plaintiff undoubtedly made numerous complaints. Plaintiff made repeated complaints to Boucher about the physical and verbal behavior exhibited by Harris, Erstgard, and Gilbert against her. Boucher was in fact present for some of the interactions between Harris, Erstgard, Gilbert, and plaintiff and thus witnessed some of the offensive conduct.
Plaintiff also complained of the abusive treatment that she witnessed those three employees perpetrate against other older female co-workers. In addition to complaining repeatedly to Boucher, plaintiff made a few complaints to Joanne Hamerly (“Hamerly”) of the HRD regarding the ongoing harassment. The plaintiff and other older women also complained to Tom Cooksey about the offensive comments made to them by Harris and Ertsgard because of their age, sex, and physical appearances. Other employees additionally complained to Boucher and Tom Cooksey about the harassment that Ertsgard, Harris, and Gilbert were leveling at the plaintiff and the uncomfortable working environment that had developed.
Almost each time that plaintiff complained to Boucher, Boucher assured plaintiff that he would take care of the problem. Plaintiff witnessed Boucher on more than one occasion call Harris and Ertsgard in to talk to them after plaintiff made her complaints. Plaintiff also witnessed one instance where plaintiff made a complaint, Boucher called Ertsgard in to talk to him, Ertsgard said he did not have to listen to “this,” and Boucher said yes, Ertsgard had to; the plaintiff described this event as “the only time I ever knew of Rod sort of stuck up for me.”
Despite Boucher’s assurances and minimal actions, and Karl Storz’s stated policy that it would not tolerate workplace harassment, Boucher issued no warnings or discipline against Harris, Ertsgard, or Gilbert; Hamerly professed not to know what to do about the ongoing harassment; and it appears that no investigation was ever conducted into the situation. With respect to one of the plaintiffs complaints to *414 Hamerly about Gilbert’s offensive conduct, Hamerly acknowledged, after plaintiffs reassignment, that Gilbert was “lacking in manners”; this was as close as the HRD came to remedial action.
3. Acts of Retaliation Following Plaintiffs Complaints
After one incident during winter 1995, plaintiff made a complaint to Tom Cooksey about Harris. A couple of days after plaintiff made that complaint, Harris approached her and said, “You talked to Tom Cooksey. And if I get in trouble for this, I’m going to get you.” Plaintiff immediately reported this threat to Boucher, but no action was taken against Harris.
In another episode in April 1996, plaintiff made a complaint to Boucher about Ertsgard; Boucher spoke with Ertsgard about the complaint; and afterwards, Ertsgard publicly stated that he was going to “give her a heart attack and get rid of her permanently.”
On a third occasion Boucher called Gerrie a whiner and laughed at some of the offensive comments made by Harris and Ertsgard.
In 1995, Boucher began assigning plaintiff to do filing work. Plaintiff inquired why Ertsgard, Gilbert, or any of the other members of the QAD were not assigned to do filing. Boucher had no response other than to instruct plaintiff to continue filing. Plaintiff also complained once to Boucher that she had been denied training that had been offered to Gilbert, who was younger and less experienced and had already been accused of harassing plaintiff multiple times. After this complaint Boucher issued a written warning to go into plaintiffs permanent file. Boucher issued another written warning to the plaintiff after another complaint to Boucher about ongoing harassment perpetrated by Harris and Ertsgard. Plaintiff had never previously received any warnings or complaints regarding her work. In addition, Harris, Gilbert, and Ertsgard frequently mimicked the plaintiffs complaints that she made to Boucher.
Finally, on May 9, 1996, less than two weeks after plaintiff complained to Boucher about Ertsgard’s heart attack comment, she was reassigned to pack boxes. Boucher informed the plaintiff of this reassignment and claimed that it was going to be a temporary reassignment. When plaintiff inquired as to why she was being reassigned but none of the others in the QAD were, Boucher claimed it was because the box packer needed help and plaintiff was being reassigned because she was the least qualified person in her department. Another employee attested to the fact that she, the other employee, needed help packing boxes, but the plaintiff appeared to be the most qualified and experienced member of the QAD; certainly the least qualified person was Gilbert, who had been hired in 1995 straight out of high school, with no further education or experience.
In June 1996, plaintiff entered a ladies’ bathroom at the factory and overheard a fellow employee admitting to a third employee that she had given a false affidavit in an internal company investigation. This employee confessed that she had provided an alibi for Ertsgard during an investigation into the criminal allegations of threatening a witness. This employee further stated that Ertsgard, Gilbert, and a third employee had coerced her into falsely swearing an affidavit to give Ertsgard an alibi. The plaintiff advised this employee that she should tell the truth and that lying under oath is a serious offense.
In August 1996, plaintiff received a memo from Boucher reprimanding her for involving herself in an ongoing company investigation into the alleged misconduct of a fellow employee. The memo did not specifically refer to the incident where the plaintiff had overheard the other employee admitting to lying in an affidavit and advising her to tell the truth. Plaintiff responded to Boucher’s memo by trying to explain the circumstances, i.e., that she had, in her view, done nothing wrong as she was merely encouraging another employee to tell the truth. Following that reply, the plaintiffs job evaluation was downgraded to “fair.”
By early August 1996, plaintiff was spending 80% of her time packing boxes. This task entailed primarily packing scopes into boxes, but also involved some computer transactions. The remainder of her time at work, plaintiff performed the clerical chores that the other men in her unit refused to do, such as filing. Plaintiff did retain her title as inspector and her same salary until she left the company. However, at no time previously had plaintiff or any other inspectors been asked to work outside of their areas or perform such assignments as packing boxes. Although plaintiff was relieved to be spending less time in the environment where she had been working with Harris, Ertsgard, and Gilbert, she was not pleased with the reassignment, which she viewed as a punitive assignment given its close proximiiy to her lodging two additional complaints with Boucher about Ertsgard and Gilbert.
The defendants now claim that the plaintiff enjoyed her new assignment and was looking forward to retirement.[1] The plaintiff, however, considered the box-packing assignment to be menial, labor and was insulted that she was assigned to this work, which did not require her extensive training and experience. Plaintiff also insists that she was not planning to retire for several more years.
Although the plaintiffs reassignment was allegedly temporary, Boucher never transferred the plaintiff back to any of her previous duties. Plaintiff asked Boucher every two weeks if she could return to her previous inspection duties and responsibilities. Each time the plaintiff made such a request, Boucher informed her that her “temporary” reassignment was to be extended again.
*415 The plaintiff grew increasingly dissatisfied with her situation. Plaintiff made numerous complaints to management about her dissatisfaction with her new responsibilities. Plaintiff was informed on or about July 9, 1996, that a new inspector’s position would become available and that she would be trained for it. The next day, the plaintiff was informed that Boucher had instructed other employees that the plaintiff not be trained for that inspector’s position, and that it would go to Gilbert instead. Plaintiff spoke to Boucher about her displeasure that an employee who was younger and less experienced than she was, and who was still harassing her, would be trained for a position instead of her. Boucher’s response was to instruct her that her box-packing assignment would be extended. Boucher then delivered to plaintiff a written warning. Plaintiff complained of the incident to Hamerly. Plaintiff informed both Hamerly and Boucher that if the harassment did not end, plaintiff would be forced to leave the company.
During this time, plaintiff was working primarily in a different area of the factory than where Gilbert was assigned to work. Despite this, Gilbert frequently visited the area where plaintiff was working and continued to mimic the way plaintiff talked and dressed. Gilbert also made offensive comments to anyone in the area about the plaintiff, continuing to refer to her as an old dyke and the like. Plaintiff continued to make complaints to Boucher as she was still being harassed by Harris and Gilbert but nothing came of these complaints.
4. Plaintiff’s Resignation, and Subsequent Administrative and Legal Proceedings
In early December 1996, the plaintiff drafted aletter of resignation, which she submitted on or about December 18, 1996. This was immediately following a confrontation with Gilbert and a fruitless report to Boucher.[2] At the time plaintiff submitted her letter of resignation, she informed Boucher that she did not want to resign but the stress of her working situation was taking a toll on her physical and mental health. Plaintiff further informed Boucher that her resignation was conditioned on Boucher’s continuing refusal to sanction plaintiffs harassers and continuing refusal to reinstate plaintiffs inspection duties. That is, the plaintiff made clear that her preference was to continue working at Karl Storz, but could only do so if Boucher punished her harassers and reinstated her inspection duties. In any case, plaintiffs resignation was not to take effect until January 8, 1997.
Between December 18,1996, when plaintiff handed in her conditional letter of resignation, and January 8, 1997, when plaintiffs resignation was to take effect, plaintiff was present working at Karl Storz for only seven days and part of an eighth. During that period, Gilbert continued to make such comments around plaintiff as “fat old dyke” and comments about doing only women’s work. Plaintiff continued to report Gilbert’s comments to Boucher. Plaintiff made the complaints to Boucher regarding Gilbert’s behavior in an open area of the QAD within the range of Gilbert’s hearing.
Despite plaintiffs clear expression of preference to remain working at Karl Storz, neither Boucher nor any other Karl Storz official took action on plaintiff s resignation; or reinstated any of plaintiffs previous inspection duties or responsibilities to her; or reprimanded Gilbert or Harris. Instead, once the plaintiff submitted her resignation, Karl Storz immediately began advertising for a clerk to fill all of plaintiffs new duties, but omitted to inform plaintiff. Plaintiff also discovered after submitting her letter of resignation that Boucher had been planning to move the job of packing boxes to workers in a different department. After her resignation, plaintiffs inspection duties were assigned to an outside firm.
Plaintiff filed a sexual harassment and retaliation complaint against defendants with MCAD on January 9, 1997. MCAD issued a Determination of Probable Cause on plaintiffs claims in November 1999. Plaintiff filed the instant action on December 17, 1999, alleging violations of the Massachusetts Fair Employment Practices Act, G.L.c. 151B (“151B”).
Defendants filed their first Motion for Summary Judgment with the Court on March 14, 2003; the Court entered its decision on July 15,2003 dismissing as time-barred the plaintiffs claims for retaliation and for discrimination based on gender and sexual orientation, but allowing her harassment (hostile work environment) claim to go forward. On November 16, 2004, defendants filed a Supplemental Motion for Summary Judgment, which the Court (Agnes, J.) denied on February 22, 2005.[3] Plaintiff then in October 2005 filed the instant Motion for Reconsideration with respect to the July 15, 2003 decision. The defendants filed an opposition, and I heard argument on November 28, 2005.

DISCUSSION

A. Summary Judgment Standard

Because this Motion for Reconsideration asks this Court to reconsider its previous decision regarding the defendants’ Motion for Summary Judgment, it is appropriate to review the standard for deciding summary judgment motions. The court appropriately grants summary judgment when the pleadings and other relevant materials show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991). The moving party bears the burden of affirmatively demonstrating that there is no triable issue of material fact. Pederson v. Time, 404 Mass. 14, 17 (1989). In making the determination as to whether a genuine issue of material fact exists, the court must consider the pleadings, depositions, answers to interrogatories, and admissions on *416 file, together with the affidavits. McGuinness v. Cotter, 412 Mass. 617, 620 (1992), citing Mass.R-Civ.P. 56(c). The substantive law will identify whether a fact in the context of the particular case is material. Hogan v. Riemer, 35 Mass.App.Ct. 360, 364 (1993). The court must consider the evidence with an indulgence in the opposing party’s favor. Id. However, to avoid summaiy judgment, the party opposing the motion is required to advance sufficient and explicit facts detailing the existence of a material issue warranting a trial on the merits. Commonwealth v. Colonial Motors Sales, Inc., 11 Mass.App.Ct. 800, 804-07 (1981). Mere allegations of the existence of material issues of fact are insufficient. See Godbout v. Cousens, 396 Mass. 254, 261 (1985).

B. Elements of a Retaliation Claim

The specific decision of which the plaintiff requests reconsideration was the decision to dismiss plaintiff s retaliation claim. There are three basic elements to such a claim under 151B: first, the employee must have been engaged in a protected activity; second, the employee must have suffered an adverse employment effect; and third, there must be a causal connection between the protected activity and the adverse effect. G.L.c. 15IB, §4(4).
An employee making an internal complaint about workplace harassment is considered to be engaging in a protected activity. See Morris v. Boston Edison, 942 F.Sup. 65, 69 (D.Mass. 1996); Proudy v. Trustees of Deerfield Acad., 19 M.D.L.R. 83, 88 (MCAD 1997). Adverse employment effects include — but are not limited to — such discrete actions as discharge, demotion, or reduction in pay. See Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005). A rebuttable presumption generally arises that an adverse action is motivated by retaliation based on a showing of the close proximity of the protected activity to the adverse action. See Fennel v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996).
In recent years, the definition of the “adverse employment action” element of a retaliation claim under 15 IB has been expanded to include a retaliatory hostile work environment. The MCAD first acknowledged “hostile or abusive workplace treatment” as satisfying the adverse action element of retaliation claims in 2002. Massachusetts Commission Against Discrimination, Sexual Harassment in the Workplace Guidelines, p. 27 (October 2, 2002). The Massachusetts Appeals Court has briefly discussed, although not explicitly acknowledged, the doctrine. See Clifton v. Mass. Bay Trans. Auth., 62 Mass.App.Ct. 164, 175-76 (2004), aff'd in part and reu’d in part, (12/21/05); Pontremoli v. Spaulding Rehab. Hosp., 51 Mass.App.Ct. 622, 625 (2001) (citations omitted). Until this week, the most thorough discussion and application of the retaliatory hostile work environment concept was to be found in the First Circuit’s decision in Noviello v. City of Boston, 598 F.3d 76 (1st Cir. 2005).
On December 21, the SJC issued its decision in the further appeal in Clifton. Two aspects of that decision, at least, are of interest for the present case.
First, the court held that a plaintiff asserting a claim for retaliation may have the benefit of the continuing violation doctrine.
Second, it held, consistently with the MCAD’s position and with the Nouiello decision, that a hostile work environment may constitute an adverse employment action for purposes of a claim for retaliation.
Quoting from the Clifton decision:
We find no basis to except a claim of retaliation, in violation of G.L.c. 15 IB, §4(4), from the proper scope of the continuing violation doctrine. The scope of G.L.c. 151B, §4(4)’s prohibition against retaliatory conduct is not limited to adverse employment decisions taken in response to the filing of a complaint with the MCAD, but includes “discriminat(ion) against any person because he has opposed any practices forbidden under this chapter.” “Workplace conduct is not measured in isolation . . .” Although unlawful retaliation, typically, may involve a discrete and identifiable adverse employment decision (e.g., a discharge or demotion), it may also consist of a continuing pattern of behavior that is, by its insidious nature, linked to the very acts that make up a claim of hostile work environment. See Noviello v. Boston, 398 F.3d 76, 89-91 (1st Cir. 2005) (concluding that creation and perpetuation of hostile work environment can comprise retaliatory adverse employment action under Title VII and under G.L.c. 151B). In sum, it is the nature of the unlawful conduct alleged by the plaintiff, independent of the precise formulation of his claim, that allows a plaintiff to invoke an exception to the limitations period for a continuing violation.
Clifton, and to some extent Nouiello, left open for discussion the precise parameters of a retaliatory harassment case. For example, it may be (and it appears to this judge, at least) that the plaintiff will need to satisfy, in combination, all of the elements of both a hostile work environment claim and a retaliation claim:
That she worked in a hostile environment involving harassment based on gender or sexual preference that was sufficiently severe and pervasive to interfere with a reasonable person’s work performance, and
Which in fact unreasonably interfered with her work performance so as to materially alter the conditions of her employment, see Muzzy v. Cahillane Motors, Inc., 434 Mass. 409, 411-12 (2001), and
That the harassment was committed by a manager or supervisor, or else was known or should have been known to the employer, and
*417 If the latter, that the employer failed to take prompt, effective, and reasonable remedial action to stop the harassment, see College Town Div. of Interco, Inc. v. Massachusetts Comm’n Against Discrimination, 400 Mass. 156, 165-67 (1987) and MCAD Sexual Harassment in the Workplace Guidelines HIIA-C (2002), and
That the co-workers’ harassment and/or the employer’s failure to remedy it was motivated, in whole or in part, by a desire to retaliate against the plaintiff for opposing the harassment: in other words, “that ‘a causal connection existed between the protected conduct and the adverse action.’ ” Mole v. University of Massachusetts, 442 Mass. 582, 591-92 (2004) (footnotes and citation omitted). Or, as the First Circuit put it much more succinctly, “a hostile work environment, tolerated by the employer, is cognizable as a retaliatory adverse employment action for purposes of’ both Title VII and Chapter 151B. 398 F.3d at 89, 91. It is of course the trial judge, not I, who will need to determine how the jury is to be instructed on these matters.
Finally, throughout the Cltfton opinion are reminders of the jury’s central role on questions concerning intent, knowledge, and similar matters — in particular, the causation element of a retaliation claim, and the triggering of the statute’s six-month and three-year statutes of limitation. By altering the gender of a few pronouns, these reminders are readily superimposed upon the evidence (viewed in the light most favorable to the plaintiff) in this case:
The evidence in this case disclosed numerous instances of hateful discriminatory conduct directed at the plaintiff that, the jury could well have found, were fueled by his initial objections to his coworkers’ insults and physical abuse informally lodged with supervisors: his later internal claims of harassment . . . and of unequal treatment in his work conditions, brought to the EEO; and, finally, his formal complaints filed with the MCAD.
One would be hard put to imagine a more shocking or outrageous scenario of discrimination in the workplace. From the viewpoint of this court, the plaintiff appears to have done everything that an employee should do in an attempt to end the discriminatory treatment to which he was subjected. It is possible, however, that a reasonable jury could find that the plaintiff “knew or reasonably should have known, more than six months prior to [his] MCAD filing, that [his] work situation was pervasively hostile and unlikely to improve and, therefore, a reasonable person in [his] position, armed with [his] knowledge, would have filed a seasonable complaint with the
MCAD.
(Emphasis supplied.)
As is apparent from the lengthy recitation of facts that began this opinion, a reasonable jury in the trial of this case could find that the plaintiff was subjected to a hostile work environment; that she brought it to her employer’s attention on numerous occasions; that there were but token and ineffectual efforts at remediation; that this constituted a continuous course of conduct on the part of both co-workers and supervisors that extended into the “anchoring period” (see Clifton and Cuddyer v. Stop & Shop Supermarket Co., 434 Mass. 521, 532-33 (2001)); and that the plaintiff nonetheless harbored the hope that management would respond to her complaints and address the issue. The jury, of course, might decide one or all of these issues against her. These are questions that our system commits, however, to trial by jury, not trial by affidavit.
I note in closing that the defendants also have filed a motion for reconsideration, addressed to Judge Agnes’s February 18, 2005 denial of their “supplemental” motion for summary judgment. Under Superior Court Rule 9D, this motion needs to be addressed to Judge Agnes, not to me. I will be returning these papers to the clerk in Worcester for forwarding. Although I have not reviewed them carefully, it appears that they concern limitations issues that may perhaps overlap to some degree with those addressed in this decision and/or the earlier decision of mine that is here reconsidered. Assuming the defendants still wish to press their motion, I will leave it to Judge Agnes to sort out what still needs to be decided, and how.

ORDER

For the foregoing reasons, the plaintiffs Motion for Reconsideration is ALLOWED, and her retaliation claim — to the extent it relates to “retaliatory harassment” — is restored to the case to be tried.

 Plaintiff did withdraw a sum of money from her 401(k) account in the fall of 1996. Defendants cite this incident as evidence of the plaintiffs intent to retire, claiming that the plaintiff withdrew the funds in part to start looking for a new residence to relocate to Minnesota; the plaintiff says that she withdrew the funds instead to help finance her upcoming holiday visit to Minnesota.

 This was another incident where plaintiff attempted, pursuant to Boucher’s instruction, to train Gilbert for inspection, but Gilbert responded that he did not work with fat old women and dykes.

 Defendants filed a Motion for Reconsideration of that denial on November 18, 2005, to which the plaintiff filed an Opposition. Those claims will not be addressed by this Court, despite the similar factual background and issues involved, because they are more appropriately decided by Judge Agnes.