General Builders Supply Co. *vs.* Arlington
Co-operative Bank & others.

Middlesex.  November 6, 1970. — June 21, 1971.

Present: Tauro, C.J., Spalding, Reardon, & Quirico, JJ.

*Equity Jurisdiction*, Mistake, Reformation. *Mortgage*, Of real estate: reformation, accounting after foreclosure, junior lienor. *Bona Fide Purchaser. Attachment. Notice.*

The record in a suit in equity did not indicate that a second mortgagee and a third mortgagee of two lots owned by one mortgagor subject to separate recorded first mortgages to a bank, or two creditors of the mortgagor who placed blanket attachments on such lots, had any knowledge of an intent of the bank and the mortgagor that he should build a house on a certain one of the lots and that no house should be built on the second lot, or any knowledge of a mistake when by inadvertence the mortgagor built a house on the second lot and no house was built on the first lot, and, all junior encumbrances having been duly recorded before the first mortgages were foreclosed, the junior lienors were then in the position of purchasers for value. [697–698]

Where it appeared in a suit in equity that a bank holding separate recorded first mortgages on lots 1, 4, 5, 9, and 10 owned by one mortgagor, each mortgage securing a separate and distinct note, and the mortgagor, had put a low face amount on the mortgage on lot 9, on which they did not intend a house to be built but on which a house was built by mistake, and had put a high face amount on the mortgage on lot 10, on which they intended a house to be built but on which no house was

built, and that when the bank foreclosed all five mortgages at the same time by separate foreclosure sales the surplus over the amount due on the mortgages on lots 1, 4, 5 and 9 amounted to about $45,000 of which a substantial portion was the surplus on lot 9, but that the foreclosure sale price on lot 10 resulted in a deficit of about $22,000 with respect to the amount due on the mortgage thereon, it was held that the bank was accountable to junior lienors with recorded encumbrances on all five lots and standing in the position of bona fide purchasers for the surplus amount of about $45,000, not merely for the net surplus of about $23,000, as contended by the bank on the ground that it should be allowed to reform its mortgages on lots 9 and 10 to achieve that result because of the mutual mistake of the mortgagor and the bank [698]; it was further held, however, that after paying the junior lienors in full, the bank was entitled to reformation of its mortgages on lots 9 and 10 as against the mortgagor only and to retain as against him a balance remaining after paying the junior lienors [698].

BILL IN EQUITY filed in the Superior Court on February 16, 1968.

The suit was heard by *Leen*, J.

*Peter Myerson* (*Leonard K. Millen* with him) for the plaintiff.

*Albert W. Wunderly* for Arlington Co-operative Bank.

QUIRICO, J. This is a bill in equity which, together with a counterclaim contained in an answer and a claim made in a petition to intervene, seeks a determination of the rights of three mortgagees and two attaching creditors to the proceeds from the foreclosure sales of first mortgages on five lots of land which were also covered by the other two mortgages and the attachments.

For the purposes of this opinion it is sufficient to identify and refer to the five parcels of land involved as lots numbered 1, 4, 5, 9 and 10. All of the lots were formerly owned by Carmen Tocco, trustee of Tocco Brothers Belmont Trust (Tocco). Tocco was the mortgagor in all of the mortgages involved in this case, and he was the defendant in the actions in which the two attachments of the real estate were made.

The parties making claims to the proceeds of the foreclosure sales, the nature of their security, and the order in which their security was obtained are as follows. (1) The Arlington Co-operative Bank (bank) held a separate first mortgage on each of the five lots, each securing a separate

and distinct note. The most recent of these mortgages was dated September 12, 1966. All of the mortgages were foreclosed by sale on February 14, 1968. (2) Mary J. Pattajo (Pattajo) held a second mortgage on lots 1, 4 and 9, a second mortgage on lot 5, and a second mortgage on lot 10. This court was informed during oral arguments that these mortgages have been paid in full out of the proceeds from the foreclosure of the first mortgages, and therefore Pattajo makes no further claim to such proceeds. (3) Domenic Iaciofano, doing business as Vic's Sidewall and Roofing Company, placed a blanket attachment on all five lots as a creditor of Tocco. After the foreclosure of the first mortgages, this claim was reduced to judgment, an execution was issued thereon, and the execution was assigned to Charles Mosesian, the intervener (Mosesian). (4) The Wil-Lynn Plastering Co., Inc. (Wil-Lynn) placed a blanket attachment on all five lots as a creditor of Tocco. (5) On March 30, 1967, Tocco gave General Builders Supply Co. (General) a blanket third mortgage on all five lots to secure a single note in the amount of $12,500. All of the mortgages and attachments were duly recorded or filed in the appropriate registry of deeds.

On February 14, 1968, the bank foreclosed its five first mortgages by holding a separate foreclosure sale as to each of the five lots. The details of the mortgages and of the foreclosure sales thereon are the following:

| Lot No. | Face Amount | Amount Due 2–14–68 | Foreclosure Sale Price | Surplus | Deficit |
|---|---|---|---|---|---|
| 1 | $ 21,000.00 | $ 6,914.37 | $ 13,200.00 | $ 6,285.63 | — |
| 4 | 14,000.00 | 5,946.08 | 10,000.00 | 4,053.92 | — |
| 5 | 30,000.00 | 31,579.02 | 36,800.00 | 5,220.98 | — |
| 9 | 14,000.00 | 6,288.29 | 36,000.00 | 29,711.71 | — |
| 10 | 30,000.00 | 31,429.82 | 9,500.00 | — | $21,929.82 |
| TOTALS | $109,000.00 | $82,157.58 | $105,500.00 | $45,272.24 | $21,929.82 |

The ultimate issue presented by this case is whether the bank is accountable to the holders of junior liens for the surplus of $45,272.24 which resulted from the foreclosure of the first mortgages on four of the lots, or for the net surplus

of $23,342.42 (surplus of $45,272.24 less deficit of $21,929.82 on lot 10).

The amounts due the holders of the junior liens when the bank foreclosed its first mortgages on February 14, 1968, were as follows:

| | |
|---|---|
| Due Pattajo as second mortgagee | $21,119.78 |
| Due Mosesian as assignee of first attaching creditor | 10,677.72 |
| Due Wil-Lynn as second attaching creditor | 1,655.00 |
| Due General as third mortgagee | 10,031.72 |
| Total due holders of junior liens | $43,484.22 |

Since all parties recognized the priority of the Pattajo mortgage over the liens of Mosesian, Wil-Lynn and General, and since the amount of the surplus from the foreclosure of the first mortgages (whether it be $45,272.24 or the net of $23,342.42) was sufficient to pay Pattajo in full, that claim has been paid. This leaves only Mosesian, Wil-Lynn and General seeking payment out of the surplus from the bank.[1]

The five first mortgages held and foreclosed by the bank were entirely separate and distinct from each other. Each secured a separate note, and each was separately foreclosed. The mere fact that all five mortgages had a common identity of mortgagors, mortgagees and junior lienholders, and that they were all foreclosed on the same day, does not permit the bank to offset the deficit resulting from the foreclosure sale of lot 10 against the surplus resulting from the foreclosure sales of the other four lots. The bank does not make such a claim, but it seeks the same result under another claim which we now reach.

By a counterclaim in its answer, the bank seeks to reform the mortgages to it on lots 9 and 10 in a manner which will result in a net surplus of $23,342.42 of the total foreclosure sale prices over the total of the balances due on the five mortgages. It alleges that it is entitled to such reformation on the basis of the following mistake of fact. On April 4, 1966, Tocco gave the bank a mortgage in the face amount of $14,000 covering lots 9 and 10. When that mortgage was

---

[1] Tocco filed no answer or appearance as defendant, and a decree was entered taking the allegations of the bill pro confesso as against him.

given both Tocco and the bank believed that Tocco would build a house on lot 10, and that no house would be built on lot 9. On September 12, 1966, with both Tocco and the bank believing a house would be built on lot 10, (a) the bank released lot 10 from its mortgage of April 4, 1966, and (b) Tocco gave the bank a first mortgage on lot 10 in the face amount of $30,000 to secure a note for money to be advanced by the bank for the building of the house. The bank then advanced money to Tocco under this mortgage with the result that the balance due thereon on February 14, 1968, when it was foreclosed, was $31,429.82. By inadvertence, Tocco built a house on lot 9 instead of 10. This fact was not discovered by Tocco or the bank until the day before the foreclosure sales on the bank's mortgages. There is nothing in the record to indicate that the second and third mortgagees and the attaching creditors had any knowledge of the intent of Tocco and the bank on this matter or that they had any knowledge of the mistake made by them.

The bank now seeks to reform its partial release of September 12, 1966, so that it will release lot 9 instead of lot 10, and to reform the mortgage given by Tocco to it on the same date so that it will describe lot 9 instead of lot 10. If such a reformation were allowed, and no changes were made in the foreclosure sale prices the results would be the following:

| Lot No. | Face Amount | Amount Due 2–14–68 | Foreclosure Sales Price | Surplus |
|---|---|---|---|---|
| 1 | $21,000.00 | $ 6,914.37 | $ 13,200.00 | $ 6,285.63 |
| 4 | 14,000.00 | 5,946.08 | 10,000.00 | 4,053.92 |
| 5 | 30,000.00 | 31,579.02 | 36,800.00 | 5,220.98 |
| 9 | 30,000.00 | 31,429.82 | 36,000.00 | 4,570.18 |
| 10 | 14,000.00 | 6,288.29 | 9,500.00 | 3,211.71 |
| TOTALS | $109,000.00 | $82,157.58 | $105,500.00 | $23,342.42 |

"It is the general rule that, where a mortgage has been discharged by mistake, equity will set the discharge aside and reinstate the mortgage to the position the parties intended it to occupy, where the rights of intervening lienors have not been affected." *North Easton Co-op. Bank* v. *MacLean,* 300 Mass. 285, 292. *Bruce* v. *Bonney,* 12 Gray,

107, 113. *Willcox* v. *Foster*, 132 Mass. 320, 323. *Short* v. *Currier*, 153 Mass. 182, 184. *Beaman-Marvell Co.* v. *Marvell*, 305 Mass. 246, 255–256. *Piea Realty Co. Inc.* v. *Papuzynski*, 342 Mass. 240, 246–247. *Provident Co-op. Bank* v. *James Talcott, Inc.* 358 Mass. 180, 189. Although the rule quoted above refers specifically to the reformation of the discharge of a mortgage, it applies equally to other documents under appropriate circumstances.

Almost as important as the general rule, and perhaps almost as frequently applied, is the limitation thereon to the effect that reformation will not be allowed where the rights of intervening lienors will be adversely affected thereby. The limitation has been applied in numerous cases to protect persons standing in the position of innocent purchasers for value without notice of the mistake of fact on the basis of which reformation is sought. In the following cases reformation was either denied or limited so that it would not adversely affect the rights of subsequent attaching creditors: *Woodward* v. *Sartwell*, 129 Mass. 210, 212. *Waltham Co-op. Bank* v. *Barry*, 231 Mass. 270, 272–273. *Hillside Co-op. Bank* v. *Cavanaugh*, 232 Mass. 157, 161 (involving a mistake in lot numbers in describing mortgaged premises). *Hendricks* v. *Shaw*, 262 Mass. 284 (denying reformation by way of an increase in amount to a first attaching creditor because it would prejudice the rights of the second attaching creditor when both were seeking payment out of the surplus from a foreclosure sale of the attached real estate). In the *Hillside Co-op. Bank* case, the court, quoting in part from the *Woodward* case, said at p. 161: "It is the settled rule that the decree of reformation takes effect from and relates back to the day of the first execution of the reformed instrument, except as to purchasers for value without notice and those standing in similar relations. It is contended that attachment creditors cannot stand in the relation of *bona fide* purchasers for value without notice. However the law may be elsewhere it is settled in this Commonwealth that 'An attaching creditor stands in the position of a purchaser for value, and, as a deed duly recorded takes precedence

of a prior deed unrecorded, so an attachment, when duly made, has the effect of a prior purchase and takes precedence of a prior unrecorded deed.'" See *Jeselsohn* v. *Park Trust Co.* 241 Mass. 388, 390; *Burke* v. *McLaughlin,* 246 Mass. 533, 538; *Stoneham Five Cents Sav. Bank* v. *Johnson,* 295 Mass. 390, 394; *Kahler* v. *Marshfield,* 347 Mass. 514, 516.

Although this case was submitted to the trial judge on a statement of agreed facts, the judge filed a document entitled "Findings of fact, rulings of law and order for decree." While he reviewed the facts upon which the parties had agreed, he made no findings of fact. Under the heading "Rulings of Law" he stated: "I rule that the remaining parties in interest in this Bill of Complaint are either mortgagees or attaching creditors having encumbrances junior to the mortgage encumbrances held by the . . . [bank]. I rule that the holders of such junior encumbrances are not bona fide purchasers for value. If they were then upon a showing that their rights would be adversely affected by allowing reformation of the two mortgage deeds then clearly such reformation should be denied. They are, as has been previously stated, either second or third mortgagees or attaching creditors whose rights do not rise to the legal dignity of innocent purchasers for value." Thereupon the judge ordered the entry of a decree granting reformation as requested by the bank. We hold that this was error.

Since the facts on which the bank bases its claim for reformation were not a matter of record in the registry of deeds for the district in which the land in question was located, they do not bind persons who, without actual notice of such facts, subsequently become purchasers for value of an interest in the land. G. L. c. 183, § 4. The statutory requirement of "actual notice" has been strictly construed. Knowledge of facts which would ordinarily put a party upon inquiry is not enough. *McCarthy* v. *Lane,* 301 Mass. 125, 128. *Tramontozzi* v. *D'Amicis,* 344 Mass. 514, 517. On the record before us the second and third mortgagees and the two attaching creditors had no notice of the mutual mistake of the bank and Tocco. As mortgagees and attaching

creditors they were in the position of purchasers for value. If the bank is not allowed to reform, the surplus from the foreclosure sales is $45,272.24. If the bank is allowed to reform, the surplus will be only $23,342.42 which, after the payment of Pattajo in full, will leave very little for Mosesian, and nothing for Wil-Lynn and General. It is obvious that to allow reformation to the bank will prejudice Mosesian, Wil-Lynn and General. The bank is not entitled to reformation to the prejudice of these three holders of junior liens. However, subject to recognizing and preserving the security of these three creditors and paying their claims in full, the bank may have the benefits which would follow from a reformation against Tocco only. *Hillside Co-op. Bank* v. *Cavanaugh,* 232 Mass. 157, 161.

The final decree is reversed. A new decree shall be entered which shall order, adjudge and decree substantially as follows: (1) that the bank received a surplus of $45,272.24 from the foreclosure of four of the first mortgages given to it by Tocco; (2) that the bank be credited with the sum of $21,119.78 which it paid to Pattajo as second mortgagee; (3) that after payment to Pattajo the bank held a balance of $24,152.46 from said surplus which it has not yet distributed; (4) that the bank add to said $24,152.46 interest computed thereon at the rate of six per cent (6%) a year from February 14, 1968, to the date of the decree (which amount will be computed by the court on entry of the decree); that the balance of such surplus and the interest added thereto be paid and distributed by the bank as follows: (a) by paying to Mosesian, Wil-Lynn and General the amount due to each on February 14, 1968, plus interest thereon from that date to the entry of the decree (which amounts will be computed by the court on entry of the decree), and (b) by paying the balance thereof to itself since no surplus would be payable to Tocco if the partial release and mortgage in question were reformed to conform to the intention of the parties thereto. Costs of appeal are to be awarded to Mosesian, Wil-Lynn and General.

*So ordered.*