Toomey, J.
INTRODUCTION
Plaintiff (lender) has brought suit against defendant (debtor) seeking equitable relief (utz compelling defendant to sign a new promissory note and mortgage), seeking judgment for the amount due on the original promissory note and seeking G.L.c. 93A relief. After jury-waived trial on June 26, 1997, the following facts are specially found as required by Mass.R.Civ.P. 52(a).
FINDINGS
1. On or about July 1, 1986, the defendant signed a promissory note obligating her to pay to plaintiff $130,000 over 15years. The interest rate was 11% and defendant was required to make 180 monthly payments of $1,477.57 each to retire her debt. The last such payment was scheduled for July 1, 2001. Defendant used the proceeds of the loan from plaintiff, memorialized by the note, to commence a business venture.
2. The note was secured by a mortgage given by defendant to plaintiff upon defendant’s property at 7 Howland Road in Fairhaven.
3. At various times between 1992 and 1995, the parties discussed the early pay-off of the debt. Plaintiff was interested in obtaining access to funds for a *197 number of purposes, both residential and commercial. There was talk between the two that, in return for defendant’s acceleration of payment of the remaining debt, plaintiff would discount a portion of the debt or pay defendant’s finance costs in connection with her obtaining the lump sum needed for the accelerated payment. The “talk” did not progress to “deal” stage and defendant continued her regular and timely payments to plaintiff in accordance with the note.
4. In summer, 1995, the parties again discussed the possibility of acceleration because of plaintiffs interest in investing in a business opportunity. They agreed that, in consideration of defendant’s immediate payment of the total amount outstanding on the note, defendant would deem the debt extinguished and discharge the mortgage given to him by defendant to secure her original debt. Defendant inquired as to the “pay-off’ figure, the total amount of her indebtedness remaining at that time. Plaintiff consulted an amortization table, previously prepared by his accountant for use in connection with his annual tax returns, and informed defendant that, as of August 1, 1995, her debt was $67,104.94. He offered to accept $67,000.00 in satisfaction of the note. The defendant agreed.
5. Defendant sought financing from a local bank, using her home and another properly as collateral, and obtained a $65,000.00 commitment which, with $2,000 from another source, was to be used by defendant to retire the note held by plaintiff. The financing agreement between defendant and her lending bank provided that the $65,000 was to be repaid in ten years, with interest at 9$E3/4% for the first five years and variable for the last five years. Defendant’s monthly payments were to be $930.76. The closing costs incurred by defendant were $1800.00.
6. On or about September 6, 1995, defendant delivered to plaintiff $67,000.00 in satisfaction of the note and defendant discharged the 7 Howland Road mortgage he had received from plaintiff.
7. In early 1996, when plaintiffs accountant was preparing his tax returns, she examined the amortization schedule he had employed to determine the “pay-off’ amount. The accountant informed the plaintiff that he had misapplied the schedule by using the August 1, 1996 total debt figure ($67,104.94) rather than the August 1, 1995 total debt figure (76,863.09).
8. The misreading, by plaintiff, of the schedule and the reliance, by defendant, upon plaintiffs interpretation of the schedule both occurred in good faith.
9. On April 8, 1996, plaintiff notified defendant of the erroneous application of the amortization schedule and sought correction.
10. On April 16, 1996, defendant responded to plaintiff to the effect that defendant was not obligated to plaintiff.
11. On June 21, 1996, after plaintiff had commenced suit, but before defendant had answered, defendant offered, as settlement, to pay plaintiff $3,000.00, which, together with the $1800.00 in closing costs incurred by the defendant, amounted to about one-half of the difference between the misread “pay-off’ figure ($67,104.94) and the actual “pay-off’ figure ($76,863.09).
DISCUSSION
The plaintiff seeks equitable relief following a mutual mistake of fact arising from a written mortgage contract. We begin with the general principle that a court of equity has broad powers which enable it to fashion appropriate remedies. As the Massachusetts Supreme Judicial Court noted, “[A] court acting under general principles of equity jurisprudence had broad power to reform, rescind, or cancel written instruments, including mortgages, on grounds such as fraud, mistake, accident or illegality.” Beaton v. Land Court, 367 Mass. 385, 392 (1975); Rice v. Winslow, 182 Mass. 273, 275 (1902). In the words of United States Supreme Court Justice Story, “A court of equity would be of little value if it could suppress only positive frauds, and leave mutual mistakes, innocently made, to work intolerable mischiefs contrary to the intention of parties.” 1 Story, Equity Jurisprudence, 12th Ed., Secs. 155, 156.
THE SUCCESSOR CONTRACT
In the case at bar, evidence adduced at trial tended to show that the intent of both parties was to accelerate mortgage payment through the immediate payment of a “payoff’ figure representing the amount owed after approximately three years of regular payments. In pursuance of that common intent, the parties orally agreed on a second contract effecting a recission of the first and a discharge of the mortgage upon a mutually agreeable sum. Under the new arrangement, the lender was to receive accelerated payment and the borrower would have the benefit of early release of liability on the debt. There was, accordingly, adequate consideration to support the creation of the second contract.
THE STATUTE OF FRAUDS/PAROL EVIDENCE CONSIDERATIONS
Generally, under the Massachusetts Statute of Frauds, any mortgage agreement is required to be in writing. G.L.c. 106, §2-201. A modification to such an agreement must also be in writing if the original contract excluded oral modifications. Id. at §2-209. The defendant, however, has not asserted, in her response to the instant claim, the absence of a writing. Nevertheless, even if we address defendant’s Statute of Frauds resistance to the suggestion that the successor contract should now be reformed, we must conclude that the Statute is no bar to the second contract’s reformation.[1]
The parol evidence rule ordinarily operates to prevent parties to a contract from denying their responsibilities under the contract. Although the general *198 common law rule is that parol evidence cannot be used in contradiction of the terms of a written agreement, there are exceptions to the rule. When mutual mistake is alleged, for example, the parol evidence rule is not a bar to the admissibility of extrinsic evidence pertaining to the intent of the parties. Polaroid Corp. v. The Travelers Indemnity Co., 414 Mass. 747, 756 (1993); Weld v. Trafton, 10 Mass.App.Ct. 879 (1980). “(E]quity refuses to enforce [the parol evidence rule] whenever it is alleged that fraud, accident or mistake occurred in the making of the instrument, and will admit parol evidence to reform the instrument, even though it is within the Statute of Frauds." Hoffman v. Chapman, 182 Md. 208, 210 (1943) (emphasis added). See also, RESTATEMENT (SECOND) OF CONTRACTS §138, cmt. c (1979). Thus, even where the Statute of Frauds may seem to block reformation of an oral agreement, extrinsic evidence of the parties’ intent may, in equity, support reformation of the oral agreement to comport with that intent.
Where, as at bar the contract in question is an oral agreement, the parol evidence rule of exclusion is inapplicable. Johnston v. Holiday Inns, Inc., 565 F.2d 790 (1st Cir. 1977). The parol evidence rule is more than a rule of evidence, it is a rule of substantive law. Kesslen Shoe Co., Inc. v. Philadelphia Fire & Marine Ins. Co., 295 Mass. 123 (1936). The rule permits evidence concerning contract negotiations and the facts and circumstances surrounding the execution of the agreement to be received in order to prove the intent of the parties or to resolve the disagreement between the parties as to the application of the contract. Fred S. James and Co. v. Hoffman, 24 Mass.App.Ct. 160 (1987). Defendant’s instant attack upon the parol evidence received at trial is, therefore, without merit.
The plaintiff claimed at trial that the misread “payoff’ figure did not represent the true intention of the parties. In such instances, the court may consider parol evidence. Reder v. Kuss, 351 Mass. 15 (1966). Both parties innocently mistook the “payoff "debt figure of $67,104.94 to be the amount due as of August 1, 1995 when the actual amount due as of that date was $76, 863.09. These figures were not so drastically apart as to put any party on notice of possible error or to place a duty on either parly to inquire. Both parties acted in good faith in their reliance upon the incorrect figure. ‘The parol evidence rule is no bar to the consideration of extrinsic evidence of intent when mistake is alleged.” Id. at 17. When an agreement does not truly express the intention of the parties because of a mutual mistake, at the time of the execution of the agreement, it may be revised by a court of equity at the request of the aggrieved party to correct the mutual mistake. Mickelson v. Barnet, 390 Mass. 786, 791 (1984). Therefore, in assessing the enforceability of the successor contract now under scrutiny, this court may take into account the parol evidence as to the parties’ intent in entering into the contract. Keith v. Thomas, 266 Mass. 566 (1929); Goode v. Riley, 153 Mass. 585 (1891). See also, Hughes, Evidence, 19 Mass. Prac. §430.
At bar, parol evidence clearly demonstrates that the objective of the successor contract was to accomplish the repayment of the balance of the loan then due. Accordingly, this court, in the exercise of its equitable powers, will reform the successor contract, in reliance on the parol evidence manifesting the mutual mistake of fact under which the parties labored and notwithstanding the reformation’s arguable incompatibility with the Statute of Frauds, to mirror the parties’ plain purpose.
THE REMEDY
In order to be entitled to reformation or recission remedies, the plaintiff must show “ ‘full, clear, and decisive’ proof of mistake.” Mickelson at 792 citing Stockbridge Iron Co. v. Hudson Iron Co., 107 Mass. 290, 317 (1871). The testimony of the parties at bar supplies compelling proof of mutual mistake entitling the plaintiff to equitable relief. In the words of Justice Harlan, “[t]hat a court of equity has power to correct this mutual mistake, make the instruments given in execution of the contract conform to the real intention of the parties as established by clear and convincing proof, and hold the parties to their actual agreement, cannot be doubted.” Adams v. Henderson, 168 U.S. 573 (1897).
A misrepresentation of a fact material to a contract, even if innocently made, is enough to justify recission. Yorke v. Taylor, 332 Mass. 368 (1955). In Yorke, the buyer was mistakenly informed by the seller that the home was assessed at a certain value; that representation was, in reality, half of the amount of actual assessment. Yorke held that the buyer was entitled to recission although he could easily have obtained the actual assessment figure by consulting town assessment records. There is, however, a requirement of bonafides if recission, based upon a mutual mistake of fact, is to be ordered. “[M]utual mistake assumes a good faith misunderstanding which is nobody’s fault.” Maloney v. Sargisson, 18 Mass.App.Ct. 341, 347 (1984). At bar, the error made was a mutual, faultless, good faith misunderstanding.
The elements necessary for recission or its cousin, reformation, are; 1) a mistake as to a “basic assumption” of the contract, 2) having a “material effect on the agreed exchange of performances,” and 3) the party seeking reformation does not bear the “risk of the mistake.” RESTATEMENT (SECOND) OF CONTRACTS §152 (1979). “A party bears the risk of mistake when ... he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient . . .” Id. at §154. Massachusetts case law is faithful to that articulation of the elements required for recission. See, e.g., Dover Pool & Raquet Club, Inc. v. Brooking, 366 Mass. 629, 633 *199 (1975); White v. White, 346 Mass. 76, 80 (1963); First Safety Fund National Bank v. Friel, 23 Mass.App.Ct. 583, 588 (1987); Maloney v. Sargisson, 18 Mass.App.Ct. 341, 347 (1984); Covich v. Chambers, 8 Mass. App. 740, 749 (1979).
Applying those principles to the case at hand, this court determines that the misread “payoff’ figure was a mutual mistake of fact as to a basic assumption of the contract, that the error had a material effect upon the agreement to exchange performances and that plaintiff did not assume the risk of mistake as the plaintiff had no awareness that he had but limited knowledge with respect to the facts surrounding the mistake. Recission or reformation of the successor contract is, therefore, an available equitable remedy.[2]
Our task is not completed, however, because the original mortgage was also discharged by mistake. The customary remedy is to reverse the discharge consistent with the reformation and place the parties back in the positions they occupied before the discharge, assuming, of course, that the rights of intervening lienors, if any, would not be prejudiced. General Builders Supply v. Arlington Co-Op Bank, 359 Mass. 691, 696 (1971). (Land owner built a house on the wrong lot by inadvertence, but the mortgaging bank was not entitled to reformation due to adversely affected intervening lienors.) At bar, relief for the plaintiff is not obstructed by the protection the law provides for intervening lienors because the evidence reveals no such third parties to have been involved. It is possible, therefore, for this court to fashion an equitable remedy which will restore the intention of the parties untainted by the “payoff’ figure error and without impacting others. The parties freely entered into the successor contract under the mistaken belief that the “payoff’ figure was accurate, and there is no legitimate reason now not to give reality to their intentions and to avoid an unconscionable enrichment of one party at the expense of the other.
A court of equity can order a discharge canceled. Waltham Co-op Bank v. Barry, 231 Mass. 270 (1918). In the case at bar, the discharge in question should be canceled because it was based upon mistake. We know that, ”[u]pon familiar principles the mere payment of less than the amount admittedly due, there being nothing in the nature of a compromise of a disputed claim, was not a valid consideration for a release of the remainder of the indebtedness.” Dickman v. McClellan, 302 Mass. 87 (1939). The parties at bar did not intend that the plaintiffs statement of the ultimate “payoff’ figure from the amortization table would carry determinative effect irrespective of its accuracy. The error was through inadvertence. To allow the defendant to benefit would be to allow an unjust enrichment. The defendant is the “unexpected beneficiary ... in consequence of another’s innocent, unfortunate neglect, for which it did not bargain.” Provident Co-Op Bank v. Talcott, 358 Mass. 180, 186 (1970). Equity will not permit one’s good faith misreading to endure if its continuation brings injury and advantage unintended to the parties.
Counsel for the defendant, citing Long v. Inhabitants of Athol, 196 Mass. 497 (1907), argues that reviving the debt would unduly burden defendant. A careful reading of Long, however, suggests that the court is not barred from returning the parties to the status quo ante simply because one party would lose, by reformation, the advantage it formerly gained from the mutual mistake. Id., at 507.[3] In the case at bar, reformation of the successor contract would not unduly burden the defendant. Reformation would only deprive her of an advantage she neither bargained for nor expected. Reformation would set the parties again on the course they both had intended to sail.
Although the goal is to restore the parties to the positions they occupied before the discharge, we cannot do so merely by reforming the successor contract and amending the mortgage to reflect the true “payoff’ figure because the defendant has been caused to expend an additional $1800 to finance her accelerated payment.[4] “When complete restoration cannot be achieved by such a reformation, however, the court may order ‘whatever conditions . . . justice and equity may require,’... so long as the defendant’s rights are protected.” Ann & Hope of Rhode Island, Inc. v. Pharmacy Services Corporation, 1997 WL 66072, 4 citing J.C. Penney Co. v. Schulte Real Estate Co., 292 Mass. 42, 45 (1935). We must, therefore, fashion a remedy that accommodates defendants’ concerns with respect to recovering the closing costs she would not have incurred but for the mutual mistake of fact.
Equity also requires that defendant not be unilaterally burdened with interest payments for the period (September, 1995 to April 1996) when, as a consequence of the mutual mistake induced by plaintiffs misreading, defendant thought herself free of interest obligations and when defendant did not have the use of plaintiffs money for which interest was being charged. The total interest for that period was $5,434.51. On the other hand, it would not be in keeping with equitable principles to place the entirety of the lost interest burden on plaintiff in this “mutual mistake” situation. Accordingly, this court deems that the parties shall be charged equally with the lost interest burden and the result shall be a $2,717.25 “setoff,” or further credit, in defendant’s favor.
A court of equity has broad-based powers. Even if the result is not that which was sought by the prevailing plaintiff, ”[h]aving launched their action seeking equitable relief, the plaintiffs were subject to a determination which would avoid inequity.” Foster v. Bartolomeo, 31 Mass.App.Ct. 592, 596 (1991). See also, Turner v. Guy, 2 Mass.App.Ct. 343, 346 (1974) (court is to “avoid inequity”)). “It was well within the discretion of the judge, based upon all the facts, circumstances, and conditions surrounding the loan, *200 to void it, to rescind it, to refund, to credit any excessive interest paid, to reform the contract, or to provide any other relief consistent with equitable principles." Beach Associates, Inc. v. Fauser, 9 Mass.App.Ct. 386, 394 (1980). This court will exercise that discretion to “avoid inequity."
CONCLUSION
The plaintiff has made a case for reformation of the successor contract and the discharge. Both parties intended that the payment of the amount due as of August 1, 1995 (in actuality, $76,863.09) should completely satisfy the note as well as discharge the mortgage. The failure to employ that particular figure as the final “payoff’ was due to a mutual mistake. The successor contract will be reformed to reflect a debt owed, as of August 1, 1995, of $76,863.09. The defendant will be credited with her payment of $67,000.00, her financing costs of $1,800.00 and her interest set-off of $2,717.25. Her total credit will be $71,517.25. The mortgage shall be reinstated in the amount of $5,345.84 and shall be discharged upon defendant’s payment to plaintiff of $5,345.84.
Because defendant’s conduct, either in refusing to remedy the mistake or in tendering a settlement offer or otherwise, has not amounted to a violation of G.L.c. 93A, plaintiff shall have no recovery upon Count III of his complaint.
ORDER
It is, therefore, ORDERED that judgment shall enter, in a manner consistent with this opinion, in favor of plaintiff Francis upon Counts I and II and in favor of defendant Pinault upon Count III of the complaint.

 This court does not understand that defendant attacks the very viability of her oral, successor contract with plaintiff to accelerate the payment. Rather, her challenge is to the proposed equitable reformation of that agreement.

 Assuming arguendo that plaintiff, who misread the “payoff’ figure from the amortization table prepared by his own accountant, thereby assumed the risk of mistake and is to be held responsible for his error, see, RESTATEMENT (SECOND) OF CONTRACTS §§152, 154 (1979), his misreading of the table would constitute a unilateral mistake. The inquiry does not end with such a characterization, however, because one who is chargeable with a unilateral mistake may nevertheless still prevail if he can shoulder the additional burden placed by the law upon those who have been unilaterally mistaken.
The unilaterally erring party may demonstrate either that the other party had reason to know of the error or had, in some fashion, caused the mistake. Alternatively, the unilaterally erring party may show the enforcement of the contract, tainted by the mistake, would be unconscionable. Id. at § 153. Because there is no evidence at bar that defendant had reason to know of, or caused, plaintiffs mistake, plaintiff must establish the unconscionability of the contract in order to prevail upon a unilateral mistake theory.
To be unconscionable, a bargain must be an obvious departure from that which a reasonable person would engage. Covich v. Chambers, 8 Mass.App.Ct. 740, n. 13 (1979). Stated a bit differently, unconscionability exists when “the sum total of [the contract’s] provisions drives too hard a bargain for a court of conscience to assist.” RESTATEMENT (SECOND) OF CONTRACTS §208, cmt. B (1979). In the instant case, defendant’s “profit” from plaintiffs unilateral (arguendo) mistake resulted in a discount of nearly ten percent of her true debt. Even when her net gain is diminished by factoring her costs of refinancing, defendant’s “windfall” is sufficiently substantial to rise to the level of objective unconscionability. Therefore, even if we accept defendant’s premise that plaintiffs mistake was unilateral, plaintiff will still, in equity, prevail upon his recission/reformation claim.

 The Long case concerned a fact pattern similar to that which obtains at bar. Long involved a plaintiff contractor who relied upon the accuracy of an erroneous estimate when he issued a bid which was too low. In Long, the error was considered a mutual mistake of a material element and the plaintiff was permitted to advance extrinsic evidence in his behalf and to recover.

 It is no answer to say, as does plaintiff, that, had she known of the true “payoff’ number, defendant would still have incurred those costs because that assumption is, on this record, wholly speculative.