Hinkle, J.
The plaintiffs filed this breach of contract action against the defendant Town of Framingham after the Town stopped providing curbside trash pickup to 540 units of low and moderate income housing owned and managed by plaintiffs. This matter is before the court on the Town’s motion for summary judgment under Mass.R.Civ.P. 56. For the reasons discussed below, after a hearing, the motion for summary judgment is allowed.
BACKGROUND
The following is taken from the summary judgment record. The undisputed facts, and any disputed facts viewed in the light most favorable to the non-moving parly, are as follows.[2] Plaintiff Pelham Corporation (“Pelham I”) owns a 286-unit apartment complex in the Town of Framingham (“the Town”), and plaintiff Pelham II Corporation (“Pelham II”) owns a 254-unit apartment complex in the Town. Plaintiff Corcoran Management Corporation (“CMC”) provides exclusive management and leasing services for the apartments owned by Pelham I and Pelham II. The apartments were constructed in 1960 as low to moderate-income housing and at that time were known as Beaver Park, Beaver Gardens and Beaver Terrace. Beginning in the 1960s, the Town provided curbside trash pickup for the 540 apartment units at these complexes.
On September 18, 1990, the Town Planning Board held a public hearing under General Laws Chapter 121A, Section 6 on Pelham I’s application for approval as a Chapter 121A corporation and for the stabilization of property taxes for 482 units of existing low/moderate-income housing at Beaver Park, Beaver Gardens and Beaver Terrace (“the Application”). The Application states in part that “(b)ecause the Project currently exists as residential housing, there will be no significant increase or decrease in public services needed by the Project.” Exhibit G to the Application contains an operating pro forma for the project, entitled “Division of Operating Expenses,” which was submitted to the MHFA. This document lists “Garbage & Trash Removal” as an allocation expense which “will be paid in proportion to the relative percentages of Tenant and Landlord in the Apartment Buildings. That is, Tenant shall pay Tenant’s Percentage (as set forth in Section 6.3 of this Lease) and Landlord shall pay the balance.” The Planning Board approved the Application, determining that the units were part of a substandard area and required rehabilitation to comply with applicable building and sanitaiy codes.
Under Chapter 121 A, the apartment complexes are tax-exempt for 40 years, during which Pelham I and *520 Pelham II make fixed payments to the Town in the form of an urban redevelopment excise in lieu of taxes. By virtue of their Chapter 121A status, Pelham I and Pelham II paid 54% less to the Town for fiscal year 2002 than they ordinarily would have.
Pelham I and Pelham II administer benefits provided by Housing and Urban Development (“HUD”) and the Massachusetts Housing Finance Agency (“MHFA”), now known as “MassHousing.” In the Pelham II complex, 218 of the units are Section 8 housing while 36 units are rented at market rate. Most units in the Pelham I complex involve subsidies from either the Housing Authority or the South Middlesex Opportunity Council. The Framingham Housing Authority (“FHA”) leases 58 units in the Pelham I complex under a 99 year lease dated August 25, 1989. Under this lease, FHA is required to pay its allocable share of operating expenses, including “costs incurred for rubbish removal from the Apartment Buildings and the Site.”
On January 26, 1990, the FHA and the Town executed a document entitled “Cooperation Agreement Regarding Payments in Lieu of Taxes to be Paid by Local Housing Authorities on State-Funded Low-Rent Housing Projects, Developed Under the 705 Program” (“the Cooperation Agreement”), concerning the 58 units in Pelham I leased by the FHA. The Cooperation Agreement provides in relevant part:
The Authority shall make annual payments (herein called “Payments in Lieu of Taxes” or P.I.L.O.T.) in lieu of [real and personal properly] taxes and in payment of Public services and facilities furnished from time to time without other cost or charge for or with respect to such housing . . .
The Municipality further agrees to furnish or cause to be furnished to the Authority and the tenants of such housing public services and facilities of the same character and to the same extent as are furnished from time to time without cost or charge to other dwellings and inhabitants in the Municipality.
On May 1, 1991, Pelham I and the Town entered into a “Contract Required by Section 6A of Chapter of Chapter 121A of the General Laws,” and Pelham II and the Town entered into a virtually identical agreement (“the 6A Agreements”). The 6A Agreements provide that under certain circumstances, Pelham I and II will make additional payments to the Town beyond the statutory excise tax. Neither agreement contains any provision relating to the provision of municipal services such as trash collection. Pelham I and Pelham II entered into Regulatory Agreements with the Department of Community Affairs on May 17, 1991 under Chapter 121A, Section 18C.
The rehabilitated apartment complexes, collectively known as the Pelham Apartments, are “garden style apartments” consisting of numerous buildings, each containing anywhere from three to ten apartment units, with each unit having access to the outside through its own front and back door.
Under Article II, Section 20.1 of the Town’s General Bylaws, the Board of Public Works (“BPWj is appointed by the Board of Selectmen. The BPWs role is to perform the statutory functions assigned to a Board of Public Works and to advise the Selectmen and the Town Manager in the areas of public policy and long-range planning of public works facilities and services. On June 28, 1999, the BPW formally approved Sanitation Policy # 1 (“the Policy”) at a public meeting. The Policy states: “The Town of Framingham will provide curbside trash removal service to dwelling units of four or under. All others will be required to seek alternative ways to remove trash from their dwelling units.” The policy of picking up trash only from dwelling units of four or under was in effect for many years before 1999 but had not been in writing. The Board of Selectmen adopted the Policy at a public meeting on August 12, 1999.
The Town then reviewed a list from the Assessor’s office of multi-family properties to determine which properties were ineligible to receive curbside trash pickup. The Pelham Apartments were not included on this list. Lists produced by the Assessor’s Office generally exclude tax-exempt properties such as the Pelham Apartments, unless the office is specifically requested to include such properties. Based on the list, the Town notified various property owners who had erroneously been receiving trash services that they were ineligible for trash pickup. For example, on September 9, 1999, the BPW sent a letter to the owner of an apartment building located at 168 Leland Street which stated in relevant part:
During a review of the Sanitation Division collection routes, it was found that the property you own at the above location has over 5 dwelling units. According to the Town of Framingham Sanitation Rules and Regulations, the Department of Public Works offers curbside collection only to properties which have four or less dwelling units . . . We will continue to collect at this location during the month of September to give you adequate time to arrange for a private collection hauler. As of October 1, 1999, we will no longer collect rubbish and recycling at the above noted location.
CMC did not receive notice from the Town in 1999 that it was ineligible for continued trash pickup. However, an e-mail produced by the plaintiffs indicates that CMC employees were aware in Januaiy of 2001 “that town ordinance states that any privately owned properties over 4 units is [sic] supposed to have there [sic] own trash pick-up ... there must have been some deal made years ago.”
In March of 2002, Town Manager George King (“King”) learned that the Pelham Apartments were receiving trash pickup from the Town. King determined that this violated the Policy because the Pelham *521 Apartments were a 540-unit apartment complex managed by a for-profit company. King contacted Carol Buonopane (“Buonopane”), the Senior Property Manager for the Pelham Apartments, concerning the situation and asked that she provide him with any written agreement or other evidence that the units were entitled to curbside pickup. Buonopane was unable to produce any document signed by Town officials agreeing to provide trash pickup, nor was she aware of any oral statements by Town officials agreeing to provide such services. However, according to Buonopane, CMC’s practice when developing an apartment community is to reach a clear understanding with local officials of all obligations to be borne by the developer and its agents, including provision of municipal services. Based on the Town’s past conduct in providing curbside trash pickup, CMC, Pelham I, and Pelham II believed that the Town had agreed to provide such services in exchange for development of the low- and middle-income housing units. The individual unit leases at the Pelham Apartments expressly provide that curbside solid waste collection is performed by the Town. CMC is not responsible for trash collection under its management contracts with Pelham I and Pelham II.
King reviewed the Chapter 121A documents relating to the Pelham Apartments and concluded that they did not obligate the Town to provide trash pickup. By letter dated March 22, 2002, King informed CMC that the Town would no longer provide the Pelham Apartments with curbside pickup as of April 30. It also came to King’s attention that the Town had been providing curbside trash pickup to numerous religious institutions and nursing homes in the Town, which was inconsistent with the Policy. By letter dated May 21, 2002, King informed the Board of Selectmen that as of July 1, 2002, the Town would no longer provide pickup to these institutions.
On August 8, 2002, the Policy was amended for purposes of clarification to state:
The Town of Framingham will provide solid waste removal service to residential properties consisting of four or less dwelling units. Apartment complexes or condominium associations consisting of more than four units are not eligible for solid waste removal sendees regardless of the building configuration or manner of ownership. Owners of residential properties not collected by the Town are required to obtain private removal of solid waste.
As of December of 2002, in conformily with the Policy, approximately 5000 residential apartment and condominium units in the Town did not receive municipal trash pickup. The only exception to the Policy, which is not in writing, is that the Town provides pickup for municipal buildings. The Town does not, however, provide pickup for state-owned buildings.
In fiscal year 2003, it cost the Town approximately $177 per household for curbside collection of trash, exclusive of indirect costs such as vehicle maintenance and overhead. The annual cost to the Town of picking up trash from all 540 of the apartment units owned by Pelham I and Pelham II is approximately $87,939.
The plaintiffs filed this action on April 30, 2002, alleging breach of contract in Count I, estoppel in Count II, and breach of the implied covenant of good faith and fair dealing in Count III. The Town filed a counterclaim seeking to recover the value of trash services provided CMC, alleging quantum meruit in Count I and unjust enrichment in Count II.
Pending resolution of this action, and under an order entered by this Court on May 3, 2002, the Pelham Apartments have continued to receive trash pickup from the Town while paying into an escrow account the pro rata cost to the Town for such service.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
The Town moves for summary judgment on Count I of the complaint which alleges that it breached a contract to provide curbside trash pickup at the Pelham Apartments. The plaintiffs bear the burden of establishing the existence of a contract and any implied terms thereof. Bernard v. Cameron & Colby Co., Inc., 397 Mass. 320, 321 (1986); Canney v. New England Telephone & Telegraph Co., 353 Mass. 158, 164 (1967). The plaintiffs concede that there is no written agreement expressly requiring the Town to provide trash pickup but contend that such an obligation can be implied by the written contracts between the parties.[3] Specifically, plaintiffs argue that in calculating the financial basis of the project and entering into the 6A Agreements obligating them to make additional payments to the Town in lieu of taxes, the parties took into consideration the fact that trash pickup was customarily provided by the Town and would not be an expense of rehabilitating and operating the Pelham Apartments.
*522 In making this argument, plaintiffs contend that the Application and the 6A Agreements must be read together as the written expression of the. parties’ agreement. In considering whether instruments from a given transaction should be read together as an integrated agreement, the court considers factors such as simultaneity of execution, identiiy of subject matter and parties, cross-referencing and interdependency of provisions. Gilmore v. Century Bank & Trust Co., 20 Mass.App.Ct. 49, 56 (1985). See also Chase Commercial Corp. v. Owen, 32 Mass.App.Ct. 248, 251 (1992).
The Application, which was executed on April 2, 1990 by the members of the Pelham Corporation and submitted to the Executive Office of Communities and Development, is not signed by any representative of the Town. It sets forth the plaintiffs’ proposed plans and obligations concerning the project but contains no reference to any obligations of the Town, although a proposed Section 6A contract with the Town is appended as an exhibit to the Application. On September 18,1990, the Town Planning Board voted to accept the Application. The 6A Agreements were executed by the plaintiffs and the Town on May 1, 1991, and specifically reference the Application in their introductory recitations. The Application and 6A Agreements are part of the same transaction in the broadest sense, and in submitting the Application, the parties clearly contemplated the execution of the 6A Agreements. Although the Town was not a signatory to the Application, it voted to accept the Application. Under these circumstances, I find and rule that it is appropriate to read the Application together with the 6A Agreements as the written expression of the parties’ agreement to determine whether the Town has an implied obligation to provide trash pickup to the Pelham Apartments.
The court must interpret a written instrument with a view to the material circumstances of the parties at the time of the execution to give effect to the end to be accomplished. Bernard v. Cameron & Colby Co., Inc., 397 Mass. at 322. “An omission to express an intention cannot be supplied by conjecture. But if the instrument as a whole produces a conviction that a particular result was fixedly desired although not expressed by formal words, that defect may be supplied by implication and the underlying intention . . . may be effectuated, provided it is sufficiently declared by the entire instrument.” Id. Reading the Application and 6A Agreements as a whole does not show that the parties intended trash pickup by the Town to be an implied obligation thereunder. The 6A Agreements set forth the plaintiffs’ obligations to make Chapter 121A payments to the Town and the Town Assessor’s obligation to assess the maximum fair cash value of the Pelham Apartments in accordance with Section 10 of the statute. The Agreements do not contain any other obligations of the Town with respect to the project and do not suggest that the parties were addressing municipal services such as trash pickup.
The statement in the Application that, “(b)ecause the Project currently exists as residential housing, there will be no significant increase or decrease in public services needed by the Project” appears to be a broad reference to the typical impact of the creation of low-income housing on all municipal services such as fire and police protection, water supply, public education, etc., and does not indicate an implied promise concerning trash pickup. In addition, the fact that a “Division of Operating Expenses” attached to the Application lists trash removal as an allocation expense does not advance the plaintiffs’ argument that the Town agreed to provide that service, because it contemplates that tenants and the owner, not the Town, will be responsible for that cost. Thus, the Application and 6A Agreements on their face do not establish that the parties intended to include an implied term obligating the Town to continue trash pickup at the Pelham Apartments.
Nonetheless, the plaintiffs contend that extrinsic evidence in the form of affidavits by John Corcoran and Paul McGrath raises a genuine issue of material fact with respect to whether the parties’ contract includes such a term. The affidavits state that Corco-ran and McGrath were members of the Board of Pelham I and II when they applied to the Town for the Chapter 121A project and negotiated the 6A Agreements. The affidavits also state that in drafting the Agreements, the parties intended that the Town be obligated to continue to provide trash removal services to the Pelham Apartments, as it had done for 30 years.
The Town contends that consideration of these affidavits would violate the parol evidence rule, which bars the introduction of extrinsic evidence to contradict, vary or broaden the terms of an integrated, unambiguous writing. See Williams v. Pittsfield Lime & Stone Co., 258 Mass. 65, 68-69 (1927); Sound Techniques, Inc. v. Hoffman, 50 Mass.App.Ct. 425, 428 (2000), rev. den., 433 Mass. 1102 (2001); Kobayashi v. Orion Ventures, Inc., 42 Mass.App.Ct. 492, 496, rev. den., 425 Mass. 1102 (1997).[4] A fully integrated writing is a statement which the parties have adopted as a complete and exclusive expression of their agreement. Starr v. Fordham, 420 Mass. 178, 188 n.8 (1995). The question of integration is a factual matter reserved for the court, and extrinsic evidence of contract negotiations and the circumstances of execution is admissible in determining whether there is an integrated writing. Id.; Antonellis v. Northgate Constr. Corp., 362 Mass. 847, 849 (1973); Charles River Mortgage Co. v. The Baptist Home of Mass., Inc., 36 Mass.App.Ct. 277, 278, rev. den., 418 Mass. 1101 (1994).
Neither the Application nor the 6A Agreements contain an integration clause. Nonetheless, these documents appear to be a complete statement of the parties’ obligations under Chapter 121A with respect to the Pelham Apartments. Where a writing shows on *523 its face that it is the entire agreement of the parties and contains all that is necessary to constitute a contract, it is presumed that the parties have placed the terms of their bargain in this form intending it to be a complete and final statement of the whole transaction. Bendetson v. Coolidge, 7 Mass.App.Ct. 798, 803 (1979). Thus, I conclude that the Application and 6A Agreements are an integrated contract, intended by the parties to be a statement of their complete agreement. Accordingly, extrinsic evidence is inadmissible, and the plaintiffs may not use the Corcoran and McGrath affidavits to forestall summary judgment.
The plaintiffs further argue that the Cooperation Agreement between the Town and the FHA obligates the Town to provide trash pickup to the Pelham Apartments. However, the plaintiffs are not a party to the Cooperation Agreement and may therefore enforce it only as a third-party beneficiary. Under Massachusetts law, only intended beneficiaries, not incidental beneficiaries, can enforce a contract. Harvard Law School Coalition for Civil Rights v. President & Fellows of Harvard College, 413 Mass. 66, 71 (1992). It is assumed that contracting parties bargain and agree for themselves and only incidentally for third persons. This assumption is overcome, giving a third person standing to sue as an intended beneficiary, when the circumstances indicate that the promisee intends to give the third person the benefit of the promised performance. Macksey v. Egan, 36 Mass.App.Ct. 463, 468, rev. den., 418 Mass. 1104 (1994). There is no evidence in the summary judgment record that the Town and FHA intended to benefit the plaintiffs in allocating expenses such as trash collection under the Cooperation Agreement.[5]
Finally, this Court rejects plaintiffs’ assertion that their status as Chapter 121A corporations precludes the Town from altering the financial incentive to rehabilitate and operate the Pelham Apartments by requiring them to pay for private trash collection. Section 6A of Chapter 121A makes developers immune “from changes in the terms and conditions of the financial arrangement, particularly the §10 tax concessions, provided for explicitly in c. 121A.” Prudential Ins. Co. of America v. Boston, 369 Mass. 542, 549 (1976). Section 6A does not, however, protect owners of Chapter 121A projects from changes “which deal with matters of general regulation of the community in a manner closely related to its health, morals, safety, and fundamental welfare.” Id. at 548. Thus, a Section 6A contract governing a developer’s income return on a project did not preclude the application of a municipal rent control ordinance to that developer’s Chapter 121A property. Id. at 549. Similarly, in this case plaintiffs’ status as Chapter 121A corporations does not preclude the Town from requiring them to bear the cost of private trash collection as do other property owners in the Town. Although the expense of trash collection might impact the plaintiffs’ return on their investment in the Pelham Apartments, trash collection is not a term and condition of financial arrangement addressed in Chapter 121 A. Thus, plaintiffs have no reasonable expectation of demonstrating breach of contract by the Town in discontinuing curbside trash pickup at the Pelham Apartments, and thus the Town is entitled to judgment as a matter of law on Count I of the complaint.
The Town also moves for summary judgment on Count II of the complaint which alleges that the Town should be estopped from denying that it is responsible for trash collection at the Pelham Apartments. Courts have refused to estop governmental entities from denying the existence or validity of a contract where statutory requirements are lacking in order to advance the fiscal management goals of those requirements. Cranberry Growers Service, Inc. v. Duxbury, 415 Mass. 354, 356 (1993); United States Leasing Corp. v. Chicopee, 402 Mass. 228, 232 (1988). In addition, the doctrine of estoppel is not applied to the government’s exercise of its public duties where to do so would frustrate policies intended to protect the public interest. Risk Management Foundation of Harvard Med. Institutions v. Commissioner of Ins., 407 Mass. 498, 510 (1990); AP East, Inc. v. Board of Assessors of Westborough, 40 Mass.App.Ct 912, 913, rev. den., 422 Mass. 1108 (1996); Highland Tap of Boston, Inc. v. Commissioner of Consumer Affairs & Lic. of Boston, 33 Mass.App.Ct. 559, 568, rev. den., 414 Mass. 1101 (1992). Finally, estoppel is generally not applied where a plaintiff received some benefit by virtue of the claimed erroneous action of the municipality. See Weiner v. Boston, 342 Mass. 67, 70 (1961) (city which mistakenly classified plaintiff as veteran for promotion purposes not estopped from denying he was veteran for retirement purposes); DiGloria v. Chief of Police of Methuen, 8 Mass.App.Ct. 506, 516 (1979) (no estoppel in town’s conduct of erroneously maintaining police officer on payroll for two years as injured). Thus, there is no basis for estopping the Town from denying the existence of a validly executed, enforceable agreement to provide trash pickup to the plaintiffs, and the Town is therefore entitled to judgment as a matter of law on Count II.
The Town also contends that it is entitled to summary judgment on Count III of the complaint, which alleges that the Town’s refusal to continue trash pickup is a breach of the implied covenant of good faith and fair dealing. In Massachusetts, there is an implied covenant in every contract that neither parly will do anything which would have the effect of destroying or injuring the other party’s right to receive the fruits of the contract. Anthony’s Pier Four, Inc. v. HBC Assoc., 411 Mass. 451, 471 (1991); Tufankjian v. Rockland Trust Co., 57 Mass.App.Ct. 173, 177 (2003). However, the requirement of good faith and fair dealing in the performance of a contract “ultimately is circumscribed by the obligations — the contractual ‘fruits’ — actually *524 contained in the contract.” Allusoft Corp. v. Palo, 237 F.3d 31, 45 (1st Cir. 2001). In this case the Town cannot be deemed to have violated the covenant of good faith and fair dealing in refusing to provide curbside trash pickup given the absence of any contractual obligation to provide the plaintiffs with this service. Cf. Levenson v. L.M.I. Realty Corp., 31 Mass.App.Ct. 127, 131 (1991) (concluding doctrine of good faith and fair dealing did not apply where no binding contract was formed). Accordingly, the Town is entitled to judgment as a matter of law on Count III of the complaint.
The Town’s Counterclaim
The Town also moves for summary judgment on its counterclaim, which seeks to recover the cost of erroneously providing the Pelham Apartments with curbside trash pick up from August 12, 1999 through April 30, 2002. The Town estimates the weekly cost to pick up trash at the Pelham Apartments to be approximately $1,509.48. Count I of the counterclaim seeks recovery under a theory of quantum meruit, and Count II seeks recovery under a theory of unjust enrichment.
In order to recover in quantum meruit, the Town must show that it expected that the plaintiffs would pay for the trash collection, and that the plaintiffs, having reason to believe the Town expected to get paid, allowed the Town to perform the trash collection without objection. Nassr v. Commonwealth, 394 Mass. 767, 777 (1985); Massachusetts Gen. Hosp. v. Brody, 16 Mass.App.Ct. 993, 994 (1983); Home Carpet Cleaning Co., Inc. v. Baker, 1 Mass.App.Ct 879, 880 (1974).
As noted, the Town also seeks to recover under a theory of unjust enrichment. A person who has been unjustly enriched at the expense of another is required to make restitution where the circumstances of the receipt or retention of the benefit conferred are such that as between the two persons, it is unjust for one to retain it. Keller v. O’Brien, 425 Mass. 774, 778 (1997); Salamon v. Terra, 394 Mass. 857, 859 (1985). Whether retention of a benefit is unjust turns on the reasonable expectations of the parties. Salamon v. Terra, 394 Mass. at 859; The Community Builders, Inc. v. Indian Motocycle Associates, Inc., 44 Mass.App.Ct. 537, 560 (1998). Where services are rendered by one party and voluntarily accepted by another, and there is no evidence that such benefits were conferred gratuitously, there is a presumption that there is an expectation of payment, as well as an implied promise to pay the reasonable worth of those services. Salamon v. Terra, 394 Mass. at 861; Popponesset Beach Assoc. v. Marchillo, 39 Mass.App.Ct. 586, 592 (1996).
It is undisputed that in accordance with the Policy, the Town intended that all buildings with more than four units would pay for private trash pickup. Plaintiffs appear to argue that the Town cannot recover under a theory of quantum meruit or unjust enrichment because following enactment of the Policy, it did not purposely provide a service intending to be paid, but rather provided trash pickup to the Pelham Apartments solely by mistake due to its own carelessness. However, unjust enrichment can occur in a situation where the benefit sought to be recovered has been acquired by a mistake of fact or law. Boyd v. Jamaica Plain Co-operative Bank, 7 Mass.App.Ct. 153, 160 n.12 (1979). Cf. General Builders Supply Co. v. Arlington Co-operative Bank, 359 Mass. 691, 695 (1971) (mortgage discharged by mistake would be reinstated to prevent unjust enrichment). “A person who has conferred a benefit upon another by mistake is not precluded from maintaining an action for restitution by the fact that the mistake was due to his lack of care.” Restatement of Restitution §59 (1936). Under the circumstances of this case, the plaintiffs’ receipt of trash pickup in violation of the Policy was such that as between the plaintiffs and the Town it is unjust for the plaintiffs to retain the benefit conferred. Accordingly, the Town is entitled to judgment as a matter of law on its counterclaim.[6]
ORDER
For the foregoing reasons, defendant’s motion for summary judgment on all counts of the complaint and on its counterclaim is ALLOWED.

This Court in its discretion DENIES the plaintiffs’ motion for a continuance under Mass.RCiv.P. 56(f) in light of the plaintiffs’ failure to explain what material evidence further discovery would produce, i.e., evidence that would influence the outcome of the present motion for summary judgment. See Commonwealth v. Fall River Motor Sales, Inc., 409 Mass. 302, 309 (1991); Resolution Trust v. North Bridge Assoc., 22 F.3d 1198, 1203 (1st Cir. 1994).

Nhe plaintiffs properly do not argue the existence of a separate oral agreement for trash pickup. See, e.g., All Seasons Services, Inc. v. Commissioner of Health & Hosp. of Boston, 416 Mass. 269, 272 (1993) (municipality not liable for implied contracts).

The plaintiffs do not appear to argue that the 6A Agreements are ambiguous. See Lumbermens Mutual Casualty Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995); Jefferson Ins. Co. of New York v. Holyoke, 23 Mass.App.Ct. 472, 475, rev. den., 399 Mass. 1104 (1987) (contract ambiguous where language at issue susceptible of more than one meaning and reasonably intelligent persons would differ as to which of two or more meanings is proper one).

In any event, nothing in the Cooperation Agreement obligates the Town to provide trash pickup to the FHA units. The Agreement merely requires the Town to provide the FHA units with the same public services provided to other dwellings and inhabitants of the Town. The Town’s Policy requires all buildings with five or more units to obtain private trash pickup.

Plaintiffs raise no underlying factual dispute regarding the counterclaim.