Smith, J.
The plaintiff Karen M. Shea (Shea), brought suit against Harvey M. Eisenberg (Eisenberg) individually and as trustee of Tañar Realty Trust, Joel B. Miller (Miller), and Perishable Management Services, alleging fraud, breach of contract, breach of the duty of good faith and fair dealing, promissory estoppel, and violation of G.L.c. 93A. Shea settled her claim with Eisenberg. The parties are before this Court on both Shea’s and Miller’s motions for summary judgment. After hearing and consideration, the release between Shea and Eisenberg is reformed so as to specifically exclude Miller from being included under the term “agents,” and Shea’s and Miller’s motions for summary judgment are DENIED.
BACKGROUND
Shea owns and operates a rental equipment business, Taylor Rental Company. In early 2001, Shea retained the Conrad Group, a real estate broker, to show her properties. She sought a properly from which she could operate her rental business and the laundromat that she was then operating. In June of 2001, Kevin Sullivan of the Conrad Group brought Shea to property located at 230 Somerville Avenue in Somerville (the property). The property was owned by Eisenberg, as trustee of the Tañar Realty Trust.
Miller, as the listing broker for the property, was Eisenberg’s agent. Shea was not impressed with the property on her first visit because it was dirty and she saw rodents. In late July, after the property had been vacated and cleaned, Shea visited for a second time. During this visit, Shea found the property much more appealing.
During this second visit to the property, Shea observed a sign on the wall of the property facing Somerville Avenue. Shea asked Miller why the sign was advertising the auto-body repair business of the next-door neighbor, George Kazazian. Shea claims that Miller told her that Kazazian’s use of the wall was pursuant to a “gentleman’s agreement” and that once Shea bought the property she could remove the neighbor’s sign. Miller, however, contends that he told Shea that the arrangement was generally “a gentlemen’s agreement type of situation” but that he did not know specifically. During further discussions regarding the property, Shea, on several occasions, informed Miller how important it was for her to prominently display a sign facing Somerville Avenue. Miller reassured her that Kazazian’s sign could be taken down.
On August 8, 2001, Shea submitted a signed Offer To Purchase Real Estate (“Offer”) and paid a deposit of $5,000.00. The Offer was subject to Shea’s satisfactory review of a hazardous waste and 2IE report and an inspection of the building. The purchase price was $1,350,000.00. Shea hired five professionals to perform due diligence including an architect, a lawyer, a building inspector, an environmental consultant and an electrical contractor. As part of this due diligence, Shea did not have her lawyer perform a title search to the property.
On December 17, 2001, Shea and Eisenberg signed a Purchase and Sale Agreement (“P&S”) and Shea paid an additional deposit of $45,000.00. The P&S contained the following two provisions.
TITLE DEED: Said premises are to be conveyed by a good and sufficient quitclaim deed running to the BUYER or to the nominee designated by the BUYER or to the nominee designated by the BUYER by written notice to the SELLER at least seven 7 days before the deed is to be delivered as herein provided, and said deed shall convey a good and clear record and marketable title thereto free from encumbrances, except... (e) Easements, restrictions and reservations of record, if any, so long as the same do not prohibit or materially interfere with the current use of said premises.
WARRANTIES AND REPRESENTATIONS: The BUYER acknowledges that the BUYER has not been influenced to enter into this transaction nor has he relied upon any warranties or representations not set forth or incorporated in this agreement or previously made in writing, except for the following additional warranties and representations, if any made by either the SELLER or the Broker (s): None made. Properly sold “as-is.”
The closing of the sale of the property was scheduled for February 13, 2002.
On February 1, 2002, Shea went to meet Kazazian, the owner of the adjoining premises. She informed him that she was planning on moving into the property soon and that he would have to remove his auto-body repair sign from the wall of the property. Kazazian informed Shea that he had a “right to the wall” because *456 of an irrevocable license agreement. Prior to receiving this information, Shea had no knowledge of the irrevocable license agreement. Shea immediately contacted Miller to inform him about what she had learned and to request a copy of the license. Miller faxed her a copy of the license agreement that evening. The license agreement allowed Kazazian to “place and maintain at no charge a certain advertising sign on the outside wall of its building, for the full length of the wall facing Merriam Street, beginning at a height of twelve feet above the ground and extending to a height ten feet short of the top of the wall.”
After Shea learned the true nature of the license agreement she informed Eisenberg that she was misled and would not close on the property. Shea insisted that the license agreement needed to be terminated for her to complete the sale. By letter dated February 18, 2002, Shea’s attorney listed numerous defects with the property including: 1) failure to terminate the license; 2) three leaking transformers, asbestos on pipes which had not been removed and upon which no report had been furnished; 3) damage to the floor of the building caused by the removal of a refrigerator; 4) grease traps that had not been cleaned and removed; and 5) a drainage point for a large drain that had not been identified. On Eisenberg’s request, the initial closing date of February 13, 2002, was rescheduled for March 15, 2002.
The P&S lapsed on March 15; 2002. On May 28, 2002, Shea sent Miller a 30-Day Demand Letter pursuant to G.L.c. 93A. On June 4, 2002, Shea made a new offer to purchase the property for $1,100,000.00 contingent on the termination of the irrevocable license. By a letter dated that same day that offer was rejected and Eisenberg stated that he continued to be willing to attempt to eliminate the sign as long as Shea agreed to close for the original price. On June 11, 2002, Singer wrote to Shea to inform her that he would be willing to reduce the price to $1,295,000.00 without eliminating the sign. On June 20, 2002, Shea counter offered for $1,270,000.00 subject to the termination of the license. On June 27, 2002, Shea informed Eisenberg that “time was of the essence” and that her offer of June 20, 2002 would expire on June 28, 2002 at noon. Time was of the essence to Shea because her then current lease expired on September 30,2002 and she had to give ninety days notice to her landlord if she intended to extend that lease.
Shea eventually accepted an offer from Eisenberg in which she would buy the property for $1.3 million dollars subject to the termination of the license. On July 29, 2002, Shea requested a walk through of the property and reiterated her condition that the Termination of the License Agreement must be executed and recorded before she would execute an amendment to the Purchase and Sale Agreement. She also notified Miller and Eisenberg that she must receive a response by August 1, 2002, in order to timely confirm to her landlord whether she intended to move out or to extend her six-month lease. Eisenberg agreed to pay Kazazian $55,000.00 to eliminate the license agreement. It is disputed whether this agreement was ever memorialized in writing. Miller claims that Attorney Singer faxed a copy of'a signed document entitled “Agreement to Release and Terminate License to Maintain Sign” (termination agreement) to Shea’s Counsel. Shea contends that the only document Miller signed was a letter confirming the agreed-upon price for the termination. None of the parties has a copy of the allegedly signed termination agreement. By letter dated August 6, 2002, Shea informed Eisenberg that she was no longer interested in the deal because of the passing of the August 1st deadline and Eisenberg’s intention not to record the termination agreement until after the parties closed on the property.
Shea subsequently filed suit against both Eisenberg and Miller. Shea settled with Eisenberg in exchange for his agreement to return $25,000.00 of her deposit. She signed a document which released Eisenberg:
and each and all of his beneficiaries, agents . . . from any and all claims, demands, actions, causes of action, contracts, agreements, losses damages, suits, accounts, covenants, obligations, promises and liabilities of every name and nature, whether in LAW or EQUITY that SHEA had or has ever had against EISENBERG . . . including but not limited to, all claims and causes of action arising from ... that certain purchase and sale agreement between the parties dated December 17, 2001; and all claims asserted or which could have been asserted . . . (emphasis added).
Shea and Eisenberg subsequently filed a stipulation of dismissal. The document was headed: “STIPULATION OF DISMISSAL WITH PREJUDICE (Re: All Claims Between Plaintiff Karen Shea and Defendant Harvey Eisenberg and All Claims Between Eisenberg and Defendants Joel Miller and Perishable Management Services.” The text of the document stated that “all claims and counterclaims asserted or which could have been asserted between the Plaintiff Shea and Defendant Eisenberg are hereby dismissed with prejudice . . .” The document further stated that “Defendant Eisenberg and Defendants Joel Miller and Perishable Management Services also hereby stipulate and agree that crossclaims asserted or which could have been asserted are hereby dismissed with prejudice ...”
DISCUSSION
The court shall grant summary judgment, pursuant to Mass.R.Civ.P. 56, where no genuine issues of material fact exist and where, viewing the record in the light most favorable to the non-moving party, the moving party demonstrates it is entitled to judgment as a matter of law. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991). The moving party must satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. *457 Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis, supra at 716.
I. The Release
This Court must first deal with whether Miller was released. Miller contends that Shea released him when she released Eisenberg “and each and all of his beneficiaries, [and] agents.” Shea, however, states that neither she nor Eisenberg intended to release Miller. The inclusion of the word “agents” in the release seems to indicate that Miller, as an intended beneficiary to the contract, is to be released. A parly is an intended beneficiary where the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. Rae v. Air Speed, Inc., 386 Mass. 187, 195 (1982). The language and the circumstances of the contract are looked at for indicia of intention. Choate, Hall & Stewart v. SCA Servs., Inc., 878 Mass. 535, 545 (1979).
Here, Shea contends that the release does not express the true intent of herself and Eisenberg because of a mutual mistake. If an agreement does not express the true intent of the parties because of a mutual mistake that existed at the time of the agreement’s execution, the contract may be revised by a court of equity at the request of the aggrieved parly to correct the mutual mistake. Mickelson v. Barnet, 390 Mass. 786, 791 (1984). “The parol evidence rule is no bar to the consideration of extrinsic evidence of intent when mistake is alleged.” Reder v. Kuss, 851 Mass. 15 (1966). Accordingly, in assessing the enforceability of the release as to Miller, this Court may take into account the parol evidence as to Shea’s and Eisenberg’s intent in entering into the release, namely whether Miller was an intended beneficiary. Keith v. Thomas, 266 Mass. 566 (1929); Goode v. Riley, 153 Mass. 585 (1891). The parol evidence before this Court clearly demonstrates that Shea and Eisenberg did not intend to release Miller. That Shea still intended to pursue claims against Miller is expressed in the “Stipulation of Dismissal with Prejudice.” That stipulation of dismissal only released Eisenberg. Both Shea’s and Eisenberg’s attorneys also indicate that they did not intend the release to apply to Shea’s claims against Miller.
Accordingly, this Court, in the exercise of its equitable powers, will reform the release to mirror Shea’s and Eisenberg’s plain purpose. The elements necessary for reformation of a contract, are: 1) a mistake as to a “basic assumption” of the contract, 2) having a “material effect on the agreed exchange of performances,” and 3) the party seeking reformation does not bear the “risk of mistake.” E.g., Dover Pool & Raquet Club, Inc. v. Brooking, 366 Mass. 629, 633 (1975); First Safety Fund National Bank v. Friel, 23 Mass.App.Ct. 583, 588 (1987); Restatement (Second) of Contracts §152 (1979). A party bears the “risk of mistake” when they are aware, at the time of the making of the contract, that they have only limited knowledge with respect to the facts to which the mistake relates but they treat this limited knowledge as sufficient. Restatement (Second) of Contracts §154.
Applying these factors to the case at hand, this Court determines that the inclusion of the word “agents” in the release was a mutual mistake of fact as to a basic assumption of the release, that the error had a material effect upon the agreement to exchange performances and that Shea did not assume the risk of mistake. Reformation of the contract is therefore an available remedy. Accordingly, the release will be reformed so as to specifically exclude Miller from being covered under the term “agents.”[2]
II. Fraud
Having found that the release does not absolve Miller, this Court now turns to Shea’s allegations of intentional misrepresentation. Shea contends that Miller, in his capacity as Eisenberg’s agent, affirmatively represented to her that should she purchase the property, she would be able to remove Kazazian’s sign and that at the time those representations were made, Miller knew they were materially false and/or acted with a willful disregard for the truth or falsity of those representations.
Miller’s attempt to overcome liability by pointing to the exculpatory clause contained in the lease is without merit. While an enforceable exculpatory clause will prevent liability for negligent misrepresentation it will not bar claims for intentional misrepresentation or fraud. Branch v. Olympic Constr., 16 Mass.App.Ct. 913, 914-15 (1983). The Appeals Court, in Sound Techniques v. Hoffman, 50 Mass.App.Ct. 425, 433-34 (2000), rev. denied, 488 Mass. 1102 (2001), stated that: “[t]o ignore a merger clause and allow recovery for a negligent misrepresentation does little to promote honesty and fair dealing in business relationships.” The Court made a clear distinction between intentional conduct such as fraud and negligent misrepresentation.
Intentional misrepresentation or fraud is present when the defendant knowingly makes a false statement of material fact to induce the plaintiff to act, and the plaintiff relies on the false statement to his detriment. Danca v. Taunton Sav. Bank, 385 Mass. 1, 8 (1982); Macoviak v. Chase Home Mortgage Corp., 40 Mass.App.Ct. 755, 760 (1996). A false statement is made knowingly when the defendant possesses actual knowledge of its falsity. Maxwell v. Ratcliffe, 356 Mass. 560, 562 (1969). A false statement is also made knowingly if it is not merely a matter of opinion, estimate, or judgment, and is regarding a fact susceptible of actual knowledge. Kozdras v. Land/Vest Props., Inc., 382 Mass. 34, 40 (1980); Powell v. Rasmussen, 355 Mass. 117, 118 (1969).
Half-truths may be as actionable as whole lies if a person speaking with reference to a given point of information does not divulge all the material facts *458 bearing upon that point. Kannavos v. Annino, 356 Mass. 42, 48 (1969). A defendant who engages in fraud or intentional misrepresentation will still be liable even if the victim would have discovered the falsity but for his lack of diligence. Yorke v. Taylor, 332 Mass. 368, 373 (1955).
In the case before this Court, there is no evidence in the record that indicates that Miller knowingly made a false statement of material fact in order to induce Shea to purchase the property, See Danca, 385 Mass. at 8. However, Shea contends that Miller told her that the sign was on the wall pursuant to a “gentleman’s agreement” and that once Shea bought the properly she could remove Kazazian’s sign. Shea also states that during further discussions Miller, who knew how important advertising space was to her, assured her that the sign could be taken down. Miller agrees that he said the sign was there pursuant to “a gentlemen’s agreement iype of situation,” but contends that he told Shea that he did not know specifically what the arrangement was. At any time during the parties’ discussions, Miller could have checked the title to the property. Clearly, whether the sign’s status was a fact susceptible of actual knowledge and not an opinion is a question of fact that must be determined at trial. See Zimmerman v. Kent, 31 Mass.App.Ct. 72, 81 (1991). It does not matter that Shea could have discovered the true nature of the agreement relating to the sign if she had conducted her own investigation. See Yorke, 382 Mass. at 373.
III. G.L.c. 93A
Miller contends that Shea’s allegations of misrepresentation do not rise to the level of a G.L.c. 93A violation. However, the failure to disclose a material fact which may influence the buyer is actionable under G.L.c. §§2(a), 9. Slaney v. Westwood Auto, Inc., 366 Mass. 688, 702-03 (1975); Mongeau v. Boutelle, 10 Mass.App.Ct. 246, 248-49 (1980). Because issues of fact remain regarding Shea’s intentional misrepresentation claim, the determination of Shea’s G.L.c. 93A claim must be made at trial.
ORDER
For the foregoing reasons, it is hereby ORDERED that the release between plaintiff Karen M. Shea and defendant Harvey M. Eisenberg is hereby reformed so as to specifically exclude defendant Joel B. Miller from being covered under the term “agents,” and plaintiff Shea’s and defendant Miller’s cross motions for summary judgment are DENIED.

 Defendant Miller, in an emergency motion, has urged this Court to consider and presumably follow the analysis and holding in McElectric, Inc. v. Travelers Casualty & Surety Company of America, Inc. (slip opinion, No. 03-P-878, May 12, 2004), a recent Appeals Court rescript decision regarding mutual mistake in the context of a release. This Court agrees with the plaintiff that the McElectric case is inapposite.